ACCEPTED
01-14-00801-CV
FIRST COURT OF APPEALS
HOUSTON, TEXAS
1/4/2015 2:55:07 PM
CHRISTOPHER PRINE
CLERK

## NO.  01-14-00798-CV
## NO. 01-14-00801-CV

FILED IN
1st COURT OF APPEALS
HOUSTON, TEXAS
1/4/2015 2:55:07 PM
CHRISTOPHER A. PRINE
Clerk
VOID CAP

# IN THE COURT OF APPEALS
# FOR THE FIRST JUDICIAL DISTRICT
# OF TEXAS AT HOUSTON

## IN THE INTEREST OF A.A.M., J.M. and I.L.M., Children

FILED IN
1st COURT OF APPEALS
HOUSTON, TEXAS
1/5/2015 8:00:00 AM
CHRISTOPHER A. PRINE
Clerk

### A.J.M., Appellant

v.

## TEXAS DEPARTMENT OF FAMILY AND
## PROTECTIVE SERVICES, Appellee

### APPEALED FROM THE 314TH
### DISTRICT COURT OF HARRIS COUNTY, TEXAS

## Trial Court Cause Nos. 2011-00219J, 2012-00305J & 2013-04476J

### ORIGINAL BRIEF OF APPELLANT A.J.M.

**WILLIAM M. THURSLAND**
**TBN 20016200**
**440 Louisiana St., Ste. 1130**
**Houston, TX 77002**
**713-655-0200; Fax: (713) 655-9035**
**Email: wmthursland@hotmail.com**

**ATTORNEY FOR APPELLANT, A.J.M.**

**ORAL ARGUMENT IS REQUESTED**
**[IF DEEMED NECESSARY]**

## IDENTIFICATION OF PARTIES AND COUNSEL

Appellant herein states that the names of all parties and counsel to this appeal are:

A.J.M., Appellant:

| At Trial | On Appeal: |
|---|---|
| J.B. Lee Bobbitt | William M. Thursland |
| Attorney At Law | Attorney At Law |
| TBN: 24078237 | TBN 20016200 |
| 405 Main St., Ste. 620 | 440 Louisiana St., Ste. 1130 |
| Houston, TX 77002 | Houston, TX 77002 |
| Tel: 713-529-6234 | Tel: 713-655-0200 x 107 |
| Fax: 281-476-7816 | Fax: 713-655-9035 |

The Texas Department of Family and Protective Services, Appellee:

| At Trial: | On Appeal: |
|---|---|
| Marc A. Ritter | Sandra D. Hachem |
| Assistant County Attorney | Sr. Assistant Harris County Attorney |
| TBN 16951500 | TBN 08620460 |
| 1019 Congress, 16th Fl | 1019 Congress, 16th Fl |
| Houston, TX 77002 | Houston, TX 77002 |
| Tel: 713-274-5246 | Tel: 713-578-3900 |
| Fax: 713-437-4700 | Fax: 713-437-4700 |

| Children A.A.M. & J.M.at Trial: | Child I.L.M., at Trial: |
|---|---|
| Juliane Crow | John Mallard |
| Attorney at Law | Attorney At Law |
| TBN 24000653 | TBN: 14052700 |
| P.O. Box 10152 | 1 Sugar Creek Ctr. Ste. 925 |
| Houston, TX 77002 | Sugar Land, TX 77478 |

Tel: 281-382-1395;                          Tel: 281-313-6800;
Fax: 713-422-2389                           Fax: 888-501-6580

J.L.D., Mother at Trial:

Oliver Sprott, Jr.
Attorney at Law
TBN: 18971700
2323 Caroline, Houston, TX 77004
Tel: 713-659-3056; Fax: 713-659-2812

P.M., I.L.M.'s Managing Conservator, at Trial:

Pro Se
3701 S. Braeswood Blvd. #39, Houston, TX  77031

## REQUEST FOR ORAL ARGUMENT

Appellant requests oral argument if deemed necessary.

## RECORD REFERENCES

Clerk's Record**:**

The Clerk's Record consists of one (1) volume in each case and is referred to herein as CR followed by the page number(s).

Reporter's Record**:**

The Reporter's Record in appeal no. 01-14-00798-CV consists of four volumes.  The relevant trial testimony is found in vol. 3 and the exhibits in vol. 4.  The record in appeal no. 01-14-00801-CV consists of eight volumes.  The relevant trial testimony is found in vol. 7 and the exhibits in vol. 8.

The trial testimony in both cases is referred to as (RR), followed by the page and line number(s).  The exhibits are referred to by the party offering same followed by the exhibit number.

<u>Statutory Citation References:</u>

Unless otherwise indicated, all statutory references made herein refer to the Texas Family Code.

## **TABLE OF CONTENTS**

IDENTIFICATION OF PARTIES AND COUNSEL      i

REQUEST FOR ORAL ARGUMENT      ii

RECORD REFERENCES      ii

TABLE OF CONTENTS      iii

TABLE OF AUTHORITIES      iii

STATEMENT OF THE CASE      1

ISSUE PRESENTED      4

<u>ISSUE ONE</u>: WAS THE EVIDENCE LEGALLY AND FACTUALLY SUFFICIENT TO SUPPORT THE TERMINATION OF APPELLANT'S PARENTAL RIGHTS UNDER §161.001(1)(E)

<u>ISSUE TWO</u>: WAS THE EVIDENCE LEGALLY AND FACTUALLY SUFFICIENT TO SUPPORT THE TERMINATION OF APPELLANT'S PARENTAL RIGHTS UNDER §161.001(1)(O)

STATEMENT OF FACTS      4

SUMMARY OF ARGUMENT      15

ARGUMENT: A. Standard of Review      18

ARGUMENT: B. Applicability of §161.004      20

ARGUMENT: C. Argument & Analysis 25

ISSUE ONE:

Applicable Legal Standard: 26

Relevant Evidence: 28

Argument & Analysis 33

ISSUE TWO:

Applicable Legal Standard: 37

Argument & Analysis 37

PRAYER 39

CERTIFICTE OF COMPLIANCE 40

CERTIFICATE OF SERVICE 40

## TABLE OF AUTHORITIES

### Federal Cases

*Santosky v. Kramer*, 455 U.S. 745, 102 S.Ct. 1388 (1982) 18

### State Cases

*Avery v. State*, 963 S.W.2d 550 (Tex. App.—Houston [1st Dist.] 1997, no writ) 27

*Elizondo v. Krist,* 415 S.W.3d 259 (Tex. 2013) 35

*Holick v. Smith*, 685 S.W.2d 18 (Tex. 1985) 18, 16

*In re A.S.,* 261 S.W.3d 76 (Tex. App. - Houston [14th Dist.] 2008, pet. denied) 26, 33

*In re D.N.,* 405 S.W.3d 863 (Tex. App. – Amarillo 2013, no pet.) 22, 26, 37

iv

*In re E.N.C.,* 384 S.W.3d 796 (Tex. 2012)        16, 35, 37

*In re G.M.,* 596 S.W.2d 846 (Tex. 1980)        20

*In re J.F.C.,* 96 S.W.3d 256  (Tex. 2002)        19, 17

*In re J.W.,* 152 S.W.3d 200  (Tex. 2006)        26, 27

*In re K.G.,* 350 S.W.3d 338 (Tex. App. – Ft. Worth 2011, pet. denied)        21

*In re S.M.R.,* 434 S.W.3d 576  (Tex. 2014)        16, 26

*Jordan  v. Dossy,* 325 S.W.3d 700 (Tex. App.—Houston [1st Dist.] 2010, pet. denied)        27

*Ruiz v. the Dept. of Family & Protective Servs.,* 212 S.W.3d 804 (Tex. App.—Houston [1st Dist.] 2006, no pet.)        20

*Tx. Dept. of Hum. Resources v. Boyd,* 727 S.W.2d 531 (Tex. 1987)        26

*Vasquez v. DFPS,* 190 S.W.3d 189 (Tex. App.—Houston [1st Dist.] 2005, pet. denied)        22

## Statutes

Tex. Family Code Ann. § 101.007        19

Tex. Family Code Ann. § 161.001(1)        20, 21, 25

Tex. Family Code Ann. § 161.001(2)        20

Tex. Family Code Ann. § 161.001(1)(E)        26

Tex. Family Code Ann. § 161.001(1)(O)        37

Tex. Family Code Ann. § 161.004        15, 20, 25, 34

Tex. Family Code Ann. § 161.103        21

_____

**IN THE COURT OF APPEALS
FOR THE FIRST JUDICIAL DISTRICT
OF TEXAS AT HOUSTON**

_____

**IN THE INTEREST OF A.A.M., J.M. and I.L.M., Children**

_____

**A.J.M., Appellant**

**v.**

**TEXAS DEPARTMENT OF FAMILY AND PROTECTIVE SERVICES,
Appellee**

_____

**On Appeal from the 314th District Court
Harris County, Texas
Trial Court Cause Nos. 2011-00219J, 2012-00305J & 2013-04476J**

_____

TO THE HONORABLE JUSTICES OF THE COURT OF APPEALS:

A.J.M., appellant (also called "father"), respectfully submits her original brief in the above styled and numbered appeal.

<u>STATEMENT OF THE CASE</u>

In regard to trial court no. 2011-00219J (appeal no. 01-14-00798-CV), on January 12, 2011, the Department of Family and Protective Services ("DFPS") filed its *Original Petition For Protection of a Child, For Conservatorship and Termination in Suit Affecting the Parent-Child Relationship* wherein it requested, inter alia., to be appointed the temporary managing conservator of A.A.M., a female born on December 16, 2006

1

and J.M., a male born on December 16, 2008. (CR 3-26) The "Decree In Suit Affecting The Parent-Child Relationship" was signed on March 27, 2012 wherein DFPS was appointed as the children's permanent managing conservator; their mother, J.L.D., was appointed their possessory conservator; and there were no findings as to their alleged father, A.J.M.[1]

On January 14, 2014 DFPS filed its *Original Motion to Modify a Prior Order, For Conservatorship and Termination in Suit Affecting the Parent-Child Relationship*. (CR 30-47)

After a bench trial before the Honorable Aneeta Jamal, the court found the evidence sufficient to support the termination of appellant's parental rights under §161.001(1)(E) and (O). It also found that termination of his parental rights was in the children's best interest. DFPS was appointed as their sole managing conservator. On September 8, 2014 the "Order Modifying a Prior Order and Granting Termination" was signed. (CR 55-64)

On September 26, 2014, A.J.M. filed his notice of appeal and on September 30, 2014 appellate counsel was appointed. (CR 83-84 & 65)

In regard to trial court nos. 2012-00305J and 2013-04476J (appeal no. 01-14-00801-CV), it appears that on January 13, 2012 DFPS filed its *Original Petition For Protection of a Child, For Conservatorship and Termination in Suit Affecting the Parent-Child Relationship* wherein it requested, inter alia., to be appointed the

---

[1] The decree was not included in the clerk's record. It was however admitted into evidence as DFPS exhibit no. 4.

temporary managing conservator of I.L.M., a male born on December 13, 2011.[2]

On December 20, 2012 the "Agreed Final Decree in Suit Affecting the Parent-Child Relationship" was signed in cause no. 2012-00305J wherein P.M. was appointed as the child's sole managing; A.J.M. was established as his father; and he and the mother were appointed as possessory conservators. (CR 87-97)

On August 5, 2013, DFPS filed its *Original Petition For Protection of a Child, For Conservatorship and Termination in Suit Affecting the Parent-Child Relationship* in cause no. 2013-04476J wherein it requested, inter alia., to be appointed again as the child's temporary managing conservator (CR 4-27)

The case was tried with its companion case to the court. On September 8, 2014 the "Order Modifying a Prior Order and Granting Termination" in cause no. 2013-04476J was signed wherein the court found the evidence sufficient to support the termination of appellant's parental rights under §161.001(1)(E) and (O). It also found that termination of his parental rights was in the child's best interest. DFPS was appointed as the child's sole managing conservator. (CR 87-97)

On September 26, 2014, A.J.M. filed his notice of appeal and on September 30, 2014 appellate counsel was appointed.[3] (CR 114-115 & 99)

---

[2] This pleading was not included in the clerk's record. However, the affidavit supporting DFPS's request to be appointed I.L.M.'s temporary managing conservator January 13, 2012 is included in the reporter's record. (DFPS #9) Appellant has requested that the record be supplemented.

[3] The mother, J.L.D., has not appealed in either case.

ISSUE ONE:   WAS THE EVIDENCE LEGALLY AND FACTUALLY
SUFFICIENT TO SUPPORT THE TERMINATION OF
APPELLANT'S PARENTAL RIGHTS UNDER §161.001(1)(E)

ISSUE TWO:   WAS THE EVIDENCE LEGALLY AND FACTUALLY
SUFFICIENT TO SUPPORT THE TERMINATION OF
APPELLANT'S PARENTAL RIGHTS UNDER §161.001(1)(O)

## STATEMENT OF FACTS

The trial began on August 21, 2014.  The first witness, Bruce Jeffries ("Jeffries"), testified that he is an employee and the custodian of records of National Screening Center ("NSC).   DFPS offered the drug test results of the mother, J.L.D., and father, marked as exhibits nos. 16 and 17, respectively, as NSC business records.   Appellant timely objected by noting that Jeffries is not an expert; did not conduct the drug tests himself; and has no personal or expert knowledge of the testing that was conducted.  The objection was overruled and the documents admitted.  (RR p. 7 – 10 & p. 11; L. 1-4)

After reviewing mother's drug tests Jeffries opined that in the beginning her drug of choice was Xanax and marihuana.  Then she "got off" marihuana but "cocaine still seems to be coming back and forth into the picture." (RR p. 20-21)

Jeffries testified NSC first saw appellant was on January 25, 2011 when hair and urine specimens were collected.  The urine test detected Xanax in "therapeutic levels . . . if there's a prescription."  The tests also revealed chronic marihuana use and "more than

4

one-time" but not chronic cocaine use. The next specimens were collected on November 5, 2011. They showed the cocaine use went up and the alcohol test was negative. NSC ran an "ingestion hair test" on January 24, 2012 that showed "cocaine at 4. 051 picograms" and marihuana at 1.0. On March 13, 2012 a UA and hair test were done which revealed that marihuana use was still "heavy" and cocaine was "at 2,119 picograms." (RR p. 22-24)

The May 22, 2012 ingestion hair test showed cocaine at 2127 picograms, which was relatively the same as the prior test. A similar test done on September 4, 2012 indicated "cocaine metabolite of 1137." (RR p. 25-26)

The March 15, 2013 UA test was "clear" although it produced a "positive alcohol result "at 1,060 nanograms" that was "nothing" to be concerned about. The "outside" hair follicle did not show "anything" but the "inside" showed cocaine at 2,016. The May 17, 2013 UA was clear and the zero tolerance test was negative for both the outside and inside. No alcohol use was detected. The June 17, 2013 UA test was clean. (RR p. 27)

On August 20, 2013 NSC ran an extended opiate urine test that did not detect any "metabolites" or alcohol. Nor were any metabolites detected on the inside of the hair. The exposure and ingestion test picked up "cocaine at 9,460 and the outside showed" he was around marihuana. The October 1, 2013 tests were negative for opiates and alcohol but showed cocaine at 2,248 and marihuana at the "cutoff," .1. The ingestion test found cocaine at 2,713 "on the inside of his body" and exposure to marihuana at 34.8. (RR p.

5

27; L. 20-25 & p. 28)

The October 8, 2013 tests were negative for opiates and alcohol. The ingestion test detected cocaine at 1,967 and the exposure test detected cocaine at 2,647. The February 4, 2014 urine test did not detect any drugs or alcohol. The ingestion extended opiate hair test found cocaine at 1,830. The ingestion and exposure test only found exposure to marihuana but noted the specimen quantity was not sufficient for a complete analysis for additional drugs.[4] (RR p. 28; L. 20-25 & p. 29)

Jeffries opined that even though cocaine shows up on "every test" appellant is "not a daily user of cocaine" but agreed he used it more than once during the pendency of the case. When asked by the trial court if cocaine was "still a problem for each parent," he answered, the test results are "consistent on low levels . . . it's not a number high in the sky; it's a relatively low number." Jeffries went on to explain that "nobody" could tell if the parents used cocaine four or five times. All that can be said is "[t]hey've done it more than one time." (RR p. 30 & p. 31; L. 1)

Jeffries agreed that no two hairs on a person's body are alike. He further agreed a hair taken from one side of the head could yield a positive result while another one taken from the other side could yield a negative result. Nevertheless, he argued that this could not have happened in this case because "Quest doesn't guess. If they produce a report, they're liable for it. It can be challenged in court." (RR p. 39)

Jeffries does not know who touches the samples once he deposits them in the

---

[4] The State later stipulated that the last drug test was done in February 2014. (RR p. 60; L. 12-21)

6

lockbox.  However, anyone can order the $250 litigation package that shows the chain of custody for each test.  If the specimen is negative, it is destroyed within seven days.  If it is positive federal guidelines require that it be kept at the laboratory for two years.  (RR p. 41-45)

When asked if obtaining the litigation package would have rendered a more accurate result Jeffries replied "Quest, a Fortune 100 company . . . is not going to take the time to do a litigation package on 180,000 specimens a day."  (RR p. 62)

DFPS exhibits 1 through 23 were admitted without objection. (RR p. 73)

DFPS case worker, Jasmine Green ("Green") testified that A.A.M. is seven, J.M. is five and I.L.M. is two.  They are placed together in a private agency foster home that is willing to adopt all the children.  DFPS filed the motion to modify with respect to A.A.M. and J.M. because the parents were not making any "progress."  Specifically, they tested positive for drugs since DFPS was appointed their managing conservator and they did not do the services outlined in their latest family service plans ("FSP"). (RR p. 73-75)

On September 6, 2013 the FSP's were created for both parents.  Appellant was asked to provide the agency with proof of income; maintain safe and stable housing; complete a parenting class; maintain a safe, stable, crime free environment; complete anger management; maintain contact with the agency; and complete a psychosocial evaluation and successfully complete individual and family counseling.  (RR p. 76)

At this time the two oldest children were placed in a foster home where they had

7

been since August 2012.  The youngest was placed with the paternal grandmother, P.M., who had previously been granted "PMC of [I.L.M.]"  (RR p. 77-78)

In June 2013 P.M. became ill and the child went back into his parents' care, which was "not supposed to occur."  The child advocate ("CASA") volunteer informed the caseworker that I.L.M. was back with his parents.  DFPS "checked on that" and found it to be true. (RR p. 79 & p. 81) In August 2013 I.L.M. was returned to his grandmother by the DFPS investigations unit "despite conservatorship telling them [the] placement may not continue."  After the child was back with P.M., DFPS filed for "a show cause hearing."  (RR p. 82-83)

After DFPS was appointed I.L.M.'s temporary conservator, he continued to live with P.M. until March 2014.  His placement changed because P.M. continued to have health problems and was not able to care for him.  P.M. did not expressly tell Green she was unable to take care of the child.  Green learned I.L.M. was "given" to a paternal aunt when P.M. was again hospitalized.  On March 29, 2014 Green found him at the aunt's house.  He was then removed and placed with his siblings in foster care.  (RR p. 84-86)

I.L.M. was "grossly behind in his speech skills" when he came into DFPS care.  He has made "extreme progress" in his verbal and social skills" and is currently in speech and cognitive therapy.  He attends daycare where he gets appropriate socialization and therapy.  Due to the structure of the home and daycare he is able to maintain an appropriate sleep and eating schedule.  (RR p. 86; L. 17-25 & p. 87; L. 1-3)

A.A.M. and J.M. are bonded with their caregiver and doing well in school. J.M. is in kindergarten and loves to read. He also wants to resume gymnastics. They have adjusted well in the foster home. Green requested that both parents' parental rights be terminated and that P.M. be removed as I.L.M.'s managing conservator. In regard to best interests she stated that despite ample time the parents "have not adjusted their lifestyle" to accommodate raising young children. In addition, they continue to put the children in danger by exposing them to drug abuse and by failing to provide a stable and structured environment. (RR p. 87-89)

The trial court noted that the 2012 decree pertaining to A.A.M. and J.M. did not specify "any specific thing that [DFPS] asked them to do." [5] The parents who were appointed possessory conservators under that decree were having supervised visits with the children at the DFPS office. The visits were appropriate and the parents were "constantly" visiting until May 2013 when they "dramatically fell off." They were not paying child support but would bring things to the visits. The parents were also required to take "random" drug tests during this period of time. (RR p. 91; L. 19-25 & 92-94)

DFPS stopped the visitations in October 2013 because the parents "went from May until September without visiting their children" and their excuses "were not adding up." A.A.M. and J.M. would wait at the DFPS office and when the parents did not show up they became angry. "In a way" this caused them to not want to see their parents. (RR p. 95 & p. 96; L. 1-14)

---

[5] The Court later observed "[t]here's no findings on him" and he "wasn't really ordered to do anything in this decree." (RR p. 104; L. 10-15)

The two oldest children's "TMC" case concluded in January 2012. I.L.M.'s TMC case did not concluded until December 2012. DFPS issued a "show cause" in August 2013 which "coincided with the [FSP] . . . in the PMC case for [A.A.M. and J.M.] as well as in [I.L.M.]'s case." Between I.L.M.'s case closing and being reopened, the parents were required "to continue to stay in a AA/NA kind of supportive program" which they did "sporadically." (RR p. 96; L. 16-25 & p. 97)

Appellant completed "a court-ordered service regarding drugs in September 2012. He continued to test positive for drugs after that and did not complete another program. When A.A.M. and J.M. first came into care in 2011 they were "behaviorally" out of control and could not be kept in any placement. They went through about five placements before the current placement was found two years ago. Due to the structure, they now exhibit appropriate behavior for a five and a seven year old. They are bonded to the current caregiver. (RR p. 98-100)

In June 2013 Green heard that I.L.M. was no longer in the care of his paternal grandmother. He was placed back with her in August 2013 and removed from her in March 2014. (RR p. 101)

When the trial court asked if DNA was done to establish appellant's paternity to the two oldest children, DFPS trial counsel responded, "I just found those results in here. It looks like it was . . . collected on 1/13/12." Nevertheless, the court pointed out the "decree doesn't even indicate he's the father." Counsel then stated the "DNA does, Judge. And it may have to do with lack of service. I don't know what happened in the

10

first case . . . but he is the Dad." (RR p. 103; L. 20-25, p. 104; L. 23-24 & p. 105; L. 1-4)

Appellant visited his children "over the course of 2011" and they know who he is. However, they do not ask to see him now. (RR p. 105)

It is DFPS policy to place children with family first. In this case they attempted to comply with the policy but "exhausted" all the family members that from time to time came to court. Green spoke to the maternal grandmother who was present in court at the inception of the case. She wanted to have the children placed with her. However, a home study was not done on her because of an open CPS case involving her daughter and her criminal history. (RR p. 106-108) Green did not visit the grandmother's home and does not know if she's employed. (RR p. 113)

Quana Smith ("Smith") the advocacy coordinator testified that in October 2013 CASA became involved in I.L.M.'s case. Her only contact with his parents was in court. However Smith agreed CASA has "the whole history of this case." She opined that it is in I.L.M.'s best interest that the parental rights be terminated because they "have not been able to prove" they can provide a safe and stable environment; they continue to "test positive in drugs;" make poor parenting decisions, and had no visit or contact "with the kids that showed that they were putting [I.L.M.'s] interest as their top priority." (RR 115; L. 17-25 & p. 116-117)

Smith has been to the child's placement and stated he has "made strides" since being removed from the paternal grandmother. He is now structured; sleeping and

talking. He is very bonded with the caregiver and is "being socialized because there was developmental delays because he spent most of his time under the maternal (sic) grandmother. Smith was not familiar with the maternal grandmother who appeared at trial. When CASA was appointed I.L.M. was already placed with P.M. and it felt "that placement was in his best interest" so they did not explore other relatives. (RR p. 117-118)

Sandra testified that is the children's maternal grandmother and resides in Harris County. She is employed as a journeyman, carpenter/builder for the Local 551 union. She is divorced and lives with her 17-year-old son. (RR p. 119-120) Sandra has attended some of the permanency planning reviews and was coming to court until about a year ago.[6] When in court she asked, "to be considered." (RR 121-122)

A permanency planning participation list dated November 16, 2011 showing Sandra attended and a letter from the principal of David G. Burnet Elementary were marked as exhibits and admitted into evidence as Mother's #2 and #3. She asked that a home study be done on her home but Green told her the "supervisor didn't want to look at [her] and the home." (RR p. 123-125)

Sandra revealed she had one CPS referral when her fifteen-year-old daughter ran away in 2011 or 2012. Another occurred seventeen years ago when her eighteen-month-old twins were walking unaccompanied in the street. (RR p. 126-128) She also revealed she had two charges involving cocaine. She "signed for four years' adjudication" and

---

[6] She came to Court on September 13 and "before that 2011, 2012 and 2013." (RR p. 121; L. 22-25 & p. 122; L. 1-4)

went through the STAR program. She was released in 2010 and has maintained her sobriety. (RR p. 129-130)

Mother's exhibits nos. 4-8 were admitted into evidence. They show programs that Sandra completed while on probation in the 338th court. (RR p. 132-134) On cross-examination, she recalled a DWI charge from 1999 or 2000. Her criminal record was admitted into evidence as DFPS #24. (RR p. 136-139)

Sandra contacted placement agencies to help get her grandchildren out of care but they never "got back" to her. She has not seen the oldest two children since October 2012 although it was not "by choice." She has never met the attorney ad litem for A.A.M. and J.M. or introduced herself to her while in Court. On the other hand, she had "no clue" who this lawyer was "before today" and the lawyer never introduced herself to Sandra. (RR p. 143-145)

After DFPS rested appellant moved for a directed verdict because "there's been no evidence to establish a material change in circumstances." The motion was denied. (RR p. 146 & p. 150; L. 5-6)

The mother, J.L.D., testified that P.M., the paternal grandmother, is I.L.M.'s managing conservator. P.M.'s daughter was in court the morning of trial. She lives with J.L.D. who told "her" they were going to court that morning but she was unaware "it was trial." (RR p. 150-151) She further testified that P.M. lives on Braeswood in apartment no. 39. A "Notice of Permanency Hearing and Trial Setting" filed on June 2, 2014 was admitted into evidence as Father's #1. It reflects the notice was mailed to

13

P.M. stated she resided in apartment no. 32 and not no. 39.  (RR p. 152-154)

J.L.D. remembers DFPS had a hard time getting the DNA results and that they came back after the trial.   She also has no doubt that appellant is the father of all three children. (RR p. 154-155)  Mother has been clean since March 2011 and agreed that she was "clean all through 2012."  (RR p. 156 & p. 157; L. 1)

A.J.M. testified his last visit with his children was November 2013.  Two weeks before his December visit Green told him the visits were ending.  She "didn't really" provide an explanation and he was visiting for "two and a half years straight."  (RR p. 158)

It has not been easy to communicate with DFPS.  Several times his phone calls were not returned.  Other times, he showed up for visits but the children were not available. The last time this happened was in September when he brought pizza for them.  Green said the foster parent could not make it and the parents just had to deal with it.  He began missing visits over a three-month period because he had to watch I.L.M. when his mother had a stroke.  (RR p. 159-160)

When P.M. improved he was going to bring the child back to her after work. However, while still at work CPS showed up at his house and returned the child to his grandmother.  I.L.M. also stayed with his sister, Sunday, for a week.  She has no drug or criminal history.  A.J.M. has been to court at least 30 times and was there at trial asking the Court to "at least have the status quo."   (RR p. 161-162)

The only change between May and August 2013 was that DFPS separated the

parents from the children because P.M. had a stroke. A.J.M.'s life was the same. He was still going to work and had completed "the services once." It was hard for him to do them again because he got a better job with more hours. The only material and substantive change in the parties' and the children's lives was that P.M. suffered a stroke. (RR p. 163)

At closing, DFPS argued that appellant admitted P.M.'s stroke constituted a "substantial and material change." It then asked for termination of all parental rights on E grounds "due to positive drug tests" and O grounds "for failure to do the service plans." (RR p. 165)

Appellant argued against there has been no material or substantial change in the children's or his circumstances since the prior orders were entered. (RR p. 167 & p. 169) The childrens' ad litems argued that appellant continued to engage in criminal activity and noted the positive drug tests. They also argued that since the latest pleadings to terminate parental rights were filed the children have been in a stable environment, which has greatly benefitted them. (RR p. 170-172)

SUMMARY OF THE ARGUMENT

As a preliminary matter the appellate court must decide if §161.004 is applicable to its sufficiency of he evidence analysis. If not, the scope of its analysis is limited to the time period between the signing of the prior orders and the date of the trial on DFPS's motions to modify. If it is, then the Court may consider evidence that was presented to the trial court before the entry of the prior orders provided the

15

"circumstances of the children, or other party affected by the order have materially and substantially changed since the date of the rendition of the order."

On appeal, appellant argues that §161.004 is not implicated in the Court's analysis because DFPS did not plead for termination under that statute in either case. Instead the live pleading it went to trial on only requested termination on §161.001(1)(A)-(T) grounds. The Family Code provides at least three independent grounds to involuntarily terminate a parent's parental rights. One of those grounds is provided by §161.004.

The Supreme Court recently affirmed the line of cases that have followed this Court's *Vasquez* holding that "termination can only be upheld a ground that was both pleaded by the party seeking termination and found by the trier of fact." *In re S.M.R.*, 434 S.W.3d 576, 581 (Tex. 2014) Therefore, because DFPS did not pled §161.004 as an independent ground for termination, the relevant evidence supporting the enumerated predicate grounds should not include evidence that was presented to the trial court prior to the prior orders.

Nevertheless, whether the Court applies §161.004 or not, the evidence is still insufficient to support the termination findings under subsections (E) and (O) in both cases.

It is well established that termination under subsection (E) must be based on more than a single act or omission and requires a voluntary, deliberate, and conscious course of conduct by the parent that endangers the child's physical and emotional well-being. *In re E.N.C.*, 384 S.W. 3d 796, 803-804 (Tex. 2012)

16

In regard to A.A.M. and J.M. if the scope of the evidence the Court considers is limited to the time period between March 27, 2012 and August 21, 2014 then there is no evidence that appellant exposed them to loss or injury or in any way jeopardized them. During this period they were in DFPS managing conservatorship and A.J.M. only visited them at the DFPS office. Similarly, at the relevant period I.L.M. was in the managing conservatorship of his grandmother. While the evidence shows A.J.M. took care of him for an unspecified period of time when his mother was ill, there is no evidence that through his conduct the child was endangered.

The scant evidence pertaining to A.A.M. and J.M. before them came into DFPS temporary conservatorship also fails to support the subsection (E) finding. This evidence consists primarily of the investigative caseworker Charlotte Yoakum's affidavit wherein she noted the children were appropriately dressed and "did not appear to have any injuries." She also found on December 31, 2010 the apartment "clean and neat."

Likewise the facts pertaining to I.L.M. before he came into DFPS temporary conservatorship are found in the Tonya Ballard affidavit. He came into care because he tested positive for marihuana at birth. He never lived with his father. Ballard described the parents' home as "very nice and well kept." While there is evidence that A.J.M. was using marihuana and possibly cocaine in December 2010 there is no showing how this fact exposed I.L.M. to danger.

Finally, appellant asserts that there is insufficient evidence to support the required

17

element under §161.001(1)(O) that the children were removed from appellant under Chapter 262 for the abuse or neglect of the children.

If the relevant time period for A.A.M. and J.M. is limited to between March 27, 2012 and August 21, 2014, there is no evidence that they were removed from appellant under Chapter 262 for the abuse or neglect inflicted upon them. In fact, at all relevant times they were in the permanent managing conservatorship of DFPS. Moreover, there was no evidence that anyone, including appellant, abused or neglect them during this period.

Similarly, I.L.M. was removed from his managing conservator, P.M., due to her illness and inability to care for him. Thus, like his siblings, he was also not removed due to abuse or neglect.

## ARGUMENT

### A. Standard of Review

The involuntary termination of parental rights is a serious matter implicating fundamental constitutional rights. *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985) The natural right existing between a parent and a child is of such a degree as to be of constitutional dimensions. *Santosky v. Kramer*, 455 U.S. 745, 758-759, 102 S.Ct. 1388, 1397-98 (1982) As a result, appellate courts strictly scrutinize termination proceedings and involuntary termination statutes are strictly construed in favor of the parent. *Holick v. Smith*, 685 S.W.2d at 20-21

Due to the severity and permanency of terminating a parent's parental rights the burden of proof is heightened to the clear and convincing evidence standard. *In re J.F.C.*, 96 S.W.3d 256, 265-266 (Tex. 2002) This standard is defined as "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." §101.007.

Because of the higher standard of proof the traditional legal and factual standards of review are inadequate.  In conducting a legal sufficiency review a court must consider all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a reasonable belief that its finding was true. Thus it assumes the fact finder resolved disputed facts in favor of its findings if a reasonable fact finder could do so. A corollary to this requirement is that a court should disregard all evidence that a reasonable fact finder could have disbelieved or found to have been incredible. This does not mean however that the court must disregard all evidence that does not support the finding. Disregarding undisputed facts that do not support the finding could skew the analysis of whether there is clear and convincing evidence. *In re J.F.C.*, 96 S.W.3d at 266;

If, after conducting its review, the court determines that a reasonable fact finder could not form a firm belief or conviction that the allegations were true, then it must conclude that the evidence is legally insufficient. *In re J.F.C.*, 96 S.W.3d at 266

In conducting a factual sufficiency review, the court must consider all the evidence equally, both disputed and undisputed, to determine if the disputed evidence is

such that a reasonable fact finder could not have resolved the disputed evidence in favor of its finding. If in light of the entire record, the disputed evidence that a reasonable fact finder could not have credited in favor of the finding is so significant that a fact finder could not have reasonably formed a firm belief or conviction, then the evidence is factually insufficient. *Id.* at 266-67

In order to involuntarily terminate parental rights, the State bears the burden of proving by clear and convincing evidence the following: (1) that the parent committed one or more of the acts or omissions specifically listed under §161.001(1); and (2) termination of the parent's rights is in the child's best interest. §161.001(2) Proof of one element does not relief the petitioner from establishing the other. *Ruiz v. Texas Dept. of Family and Protective Servs.,* 212 S.W.3d 804, 812 (Tex. App.—Houston [1st Dist.] 2006, no pet.) The State has the burden of proof as to all grounds and elements of its case by clear and convincing evidence. Appellant has no burden of proof. *In re G.M.,* 596 S.W.2d 846, 847

## B. Applicability of §161.004

As a threshold matter, the reviewing court must determine if §161.004 is implicated in conducting its sufficiency of the evidence analysis under subsections (E) and (O) where DFPS only pled for termination under §161.002 and §161.001(1)(A)-(T) but not under §161.004.

§161.004 sets forth the requirements for termination when termination has been previously denied:

20

(a) The court may terminate the parent-child relationship after rendition of an order that previously denied termination of the parent-child relationship if:

(1) the petition under this section is filed after the order denying termination was rendered;

(2) the circumstances of the child, parent, sole managing conservator, possessory conservator, or other party affected by the order denying termination have materially and substantially changed since the date the order was rendered;

(3) the parent committed an act listed under Section 161.001 before the date the order denying termination was rendered; and

(4) termination is in the best interest of the child.

(b) At a hearing under this section, the court may consider evidence presented at a previous hearing in a suit for termination of the parent-child relationship of the parent with respect to the same child.

The Fort Worth Court of Appeals rejected a mother's contention that §161.004 provide the *only* [emphasis in original] way the trial court could terminate her parent rights after it had rendered a previous order denying DFPS's request for termination. *In re K.G*, 350 S.W.3d 338, 352 (Tex. App. – Ft. Worth 2001, pet. denied) (noting Texas case law supports the contention that parental rights could be terminated under either section 161.001or section 161.003)

However, the court further observed using §161.004 is the only way that the trial court could terminate her parental rights based upon "evidence presented at the hearing before the trial issued its December 17, 2008 denial of the first petition to terminate." It concluded that the trial court erred by admitting evidence from before the December 17, 2008 denial "when DFPS did not plead section 161.004 as a ground to terminate Mother's parental rights." Ultimately, the court's treatment of §161.004 was not

dispositive to the appeal because the evidence of constructive abandonment occurring after the order denying termination was sufficient to support the subsection (N) finding. *Id*. at 352

The Amarillo Court of Appeals recently adopted the reasoning of *In re K.G.* It found that a trial court could terminate the parent-child relationship even though it previously denied termination in a previous order using §161.001 alone if termination is sought on evidence of acts or omissions having occurred since the earlier order in which termination was denied. However, to rely on evidence of acts or omissions that were presented to the trial court before the earlier order denying termination DFPS "must garner sufficient evidence of section 161.004's elements, including a material and substantial change of the parties circumstances." *In re D.N.*, 405 S.W.3d 863, 870 (Tex. App. – Amarillo 2013, no pet.) The court also noted it can only uphold the trial court's order on a basis that was properly pled and found as the basis for termination in the judgment. *Id*. at 870 (citing *Vasquez v. DFPS*, 190 S.W.3d 189, 194 (Tex. App. – Houston [1st Dist.] 2005, pet. denied)

Procedural Posture of the First Case:

On January 12, 2011 DFPS filed its original petition wherein it averred that A.J.M. was A.A.M. and J.M.s alleged father and requested that his parental rights be terminated under §161.002 or, if he was established to be the father, under §161.001(1)(A)-(T). (CR 3-26)

On March 27, 2012 the Final Order was signed. It made no findings as to A.J.M.

and recited "all relief requested in this case and not expressly granted is denied." (DFPS #4 – paragraphs 7 & 21)

On January 8, 2014 DFPS filed its original motion to modify seeking termination of appellant's parental rights. While it alleged the "circumstances of the children, or other party affected by the order have materially and substantially changed since the date of the rendition of the order" it failed to allege any facts to support its contention. Moreover, DFPS only requested that father's rights be terminated under §161.002 and §161.001(1)(A)-(T). It did not request termination of appellant's paternal rights under §161.004 nor did it file any amended pleading prior to trial that sought termination under §161.004. (CR 30-47 – paragraphs 8.1.1.1. & 10)

The Modification Order entered on September 8, 2014 found, in relevant part:

2.4. the "material allegations contained in the Department's *Motion to Modify* are true;

7. [A..J.M.] is . . . the father of the children [A.A.M. and J.M.]

8.1 . . . some of the evidence considered in this trial related to events occurring before a prior order denying termination, and such evidence was admissible pursuant to §161.004; and,

8.2 . . . the petition for termination in this case was filed after the date that an order denying termination of the parent-child relationship of [J.L.D.] was rendered, that the circumstances of the children, parent, sole managing conservator, possessory conservator, or other party affected by the prior order have materially and substantially changed since the prior order was rendered, and that, before the prior order was rendered, said parent committed an act listed under §161.001."

(CR 55-57)

Procedural Posture of the Second Case:

It appears DFPS filed its original petition in I.L.M.'s case on or about January 13,

23

2012 based on the removal affidavit of DFPS investigative caseworker, Tonya Ballard. (DFPS #9) The original petition was not included in the clerk's record.

The Agreed Final Decree in cause no. 2012-00305J was signed on December 20, 2012 wherein P.M. was appointed I.L.M.'s sole managing conservator; A.J.M. was adjudicated to be his father and the parents were appointed possessory conservators. It also recited "all relief requested in this case and not expressly granted is denied." (CR 87-97) (DFPS #10)

On August 5, 2013 rather than file a motion to modify under cause no. 2012-00305J, DFPS filed another original petition in cause no. 2013-04476J wherein it again requested to be appointed the child's temporary managing conservator and requested that appellant's parental rights be terminated under §161.001(1)(A)-(T). (CR 4-27)

On August 8, 2013 DFPS filed its first amended petition wherein it named P.M. as an additional respondent. This was the last pleading filed before trial and it alleged, in relevant part:

12.1.1.1 The "circumstances of the child, a conservator, or other party affected by the order have materially and substantially changed since the date of the rendition of the order; and

12.1.4 The order to be modified is entitled Original Petition For Protection of A Child, And For Conservatorship and Termination in Suit Affecting The Parent-Child Relationship And Order Setting Hearing and is dated the 5th day of August, 2013.
(CR 33-48)

DFPS failed to offer any facts to support the allegations that the circumstances of the child or a conservator had materially and substantially changed since December 20, 2012. In contrast to the original petition DFPS did not incorporate the removal affidavit

24

of its caseworker Miranda Harris. (CR 19-27) However, like the original petition it only requested that A.J.M.'s rights be terminated under §161.001(1)(A)-(T) and not under §161.004 (CR 33-48)

The Modification Order entered on September 8, 2014; in cause no. 2013-04476J; found, in relevant part:

2.3 the material allegations contained in the Department's *Motion to Modify* are true;

6. The circumstances of the Child or Sole Managing Conservator, Possessory Conservator, or other party affected by the prior order entitled AGREED FINAL DECREE IN A SUIT AFFECTING THE PARENT-CHILD RELATIONSHIP, dated December 12, 2012, and entered in Cause Number 2012-00305J . . . have materially and substantially changed since the rendition of the order to be modified . . .

8.1 . . . some of the evidence considered in this trial related to events occurring before a prior order denying termination, and such evidence was admissible pursuant to §161.004;" and,

8.2 . . . the petition for termination in this case was filed after the date that an order denying termination of the parent-child relationship of [J.L.D.] was rendered, that the circumstances of the children, parent, sole managing conservator, possessory conservator, or other party affected by the prior order have materially and substantially changed since the prior order was rendered, and that, before the prior order was rendered, said parent committed an act listed under §161.001."

(CR 87-89)

## C. Argument & Analysis

While the necessary §161.004 findings are recited in the subject modification orders DFPS did not plead for termination under that statute in either case. Instead the live pleading it went to trial on only requested termination on §161.001(1)(A)-(T) grounds.

The Supreme Court recently affirmed the line of cases that have followed this

25

Court's *Vasquez* holding that "termination can only be upheld a ground that was both pleaded by the party seeking termination and found by the trier of fact." *In re S.M.R.*, 434 S.W.3d 576, 581 (Tex. 2014)

Therefore, because DFPS did not pled §161.004 as an independent ground for termination, the relevant evidence supporting the enumerated predicate grounds should not include evidence that was presented to the trial court prior to the prior orders. *In re D.N.*, 405 S.W.3d at 871-872 (holding that evidence presented to the trial court prior to the final order could not be considered by appellate court where subject order did not include §161.004 references) The relevant time period in the case of A.A.M. and J.M. is March 27, 2012 to the date of trial August 21, 2013 and in I.L.M.'s case December 20, 2012 to August 21, 2013.

ISSUE ONE:   WAS THE EVIDENCE LEGALLY AND FACTUALLY SUFFICIENT TO SUPPORT THE TERMINATION OF APPELLANT'S PARENTAL RIGHTS UNDER §161.001(1)(E)

### Applicable Legal Standard

To support the termination of parental rights under §161.001(1)(E), the State must prove that the parent "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child." The relevant inquiry under this section involves the parent's acts and omissions. *In re J.W.,* 152 S.W.3d 200, 205 (Tex. 2006)

Termination under subsection (E) "must be based on more than a single act or omission and requires a voluntary, deliberate and conscious course of conduct by the

26

parent that endangers the child's physical and emotional well-being." *Id.* at 205; *In re: A.S.*, 261 S.W.3d 76, 86 (Tex. App. - Houston [14th Dist.] 2008, pet. denied)

Endangerment is defined as "to expose to loss or injury; to jeopardize." *Texas Dept. of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987). Although "endanger" means more than a threat of metaphysical injury or the possible ill effects of a less-than ideal environment, it is not necessary that the conduct be directed at the child or that the child actually suffers injury.

In addition, under subsection (E), the cause of the endangerment must be the direct result of the parent's conduct alone and must be the result of a conscious course of conduct rather than a single act or omission. *In re A.S.* 261 S.W.3d at 83 Thus, the relevant inquiry is whether evidence exists that a parental course of conduct endangered the child's physical or emotional well-being. *Jordan v. Dossey,* 325 S.W. 3d 700, 713 (Tex. App. – Houston [1st Dist.] 2010, pet. denied)

Evidence of a parent's past conduct, including criminal history, may be relevant if it shows a conscious course of conduct occurring both before and after a child's birth. *Avery v. State,* 963 S.W.2d 550, 553 (Tex. App.—Houston [1st Dist.] 1997, no writ) While it is not necessary that the endangering conduct be directed at the child or that the child actually suffers an injury, the child must be exposed to loss or injury. *In re: J.W.,* 225 S.W.3rd at 205

Appellant contends that the evidence is legally and factually insufficient to support the termination finding under subsection (E) for all three children whether or not the Court applies §161.004. Nevertheless, in the event the Court finds that §161.004 is relevant in conducting its sufficiency of the evidence analysis evidence relating to events that occurred before the prior orders were entered is also reviewed. In addition because the endangerment evidence, or lack of it, pertaining to A.A.M. and J.M. is different from that pertaining to I.L.M. it is reviewed separately.

Evidence Relating to A.A.M. and J.M. Between March 27, 2012 and August 21, 2014:

During this period, the children have been in DFPS permanent managing conservatorship and have been in the same adoptive foster home since August 2012. They are bonded to the current caregiver.

Evidence Relating to A.A.M. and J.M. Before March 27, 2012:

Green testified when A.A.M. and J.M. came into care in 2011 they were out of control and went through five placements.

According to the Yoakum affidavit dated January 12, 2011 (DFPS #12) DFPS received a referral on September 21, 2010 that alleged physical abuse and neglectful supervision of the children by their parents. She interviewed the parents at their apartment in December 30, 2011. The stove and refrigerator did not work. There was no food in the refrigerator and no furniture in the bedroom. The children slept on an air mattress and the parents on the sofa.

Appellant admitted smoking marihuana but agreed to stop and cooperate with DFPS. He denied knowing that J.L.D. smoked marihuana but she later tested positive. He admitted being charged in 2010 with assaulting J.L.D. but denied committing the offense.

The children did not disclose any abuse and had no injuries, marks or bruises. Yoakum returned to the apartment on December 31, 2010 and found it "clean and neat." The children were appropriately dressed and "did not appear to have any injuries."

Evidence Relating to I.L.M. Between December 20, 2012 and August 21, 2014:

In December 2012 I.L.M. was placed with his paternal grandmother, P.M. She suffered a mild stroke in June 2013 and at that time Green heard that he was no longer in her care.

The Harris affidavit (DFPS #11) states that on July 25, 2013 she found I.L.M. at the parents' residence. Appellant explained the child was only with them until P.M. recovered from her stroke. J.L.D.'s sister would supervise their visits but she was not home. The parents signed a safety service plan agreeing not to visit I.L.M. until further notice from DFPS. Harris also interviewed P.M. who stated she had a "mild stroke" on June 6, 2013. She let A.J.M. care for his son due to the stroke. The child was returned to her care and she agreed to not allow contact between the parents and I.L.M. until notified by DFPS.

According to Green, I.L.M. was placed back with P.M. in August 2013 and removed from her in March 2014 due to her health problems. He was then placed in

foster home with his siblings. He was behind on speech skills and has made progress on his verbal & social skills. The child sleeps and eats better due to the foster home's more structured environment.

Smith was assigned to I.L.M.'s case after he was placed in foster care. Since being placed there he has made great strides and is bonded to the caregiver.

A.J.M. testified he was only taking care of I.L.M. because his mother suffered a stroke. His sister, Sunday also cared for him. She has no criminal or drug history.

Evidence Relating to I.L.M. Before December 20, 2012:

The Ballard affidavit (DFPS #9) states she began her investigation because when I.L.M. was born his mother had an open CPS case. She later learned that the child's "meconium screen result" was positive for marihuana. Ballard saw the parents' home and described it as "very nice and well kept." There was a baby bed and bunk beds for the older children in anticipation of their return home. When informed of the child's positive marihuana result, A.J.M. denied using drugs or knowing that J.L.D. used drugs.

Evidence Relating to Appellant Between March 27, 2012 and August 21, 2014:

According to Green, appellant was visiting his older two children at the DFPS office "constantly" and visits were appropriate until May 2013. He did not visit from May through September. He completed court ordered drug program in September 2012 but continued to test positive after that.

Appellant testified he last visited the children in November 2013. Two weeks before his Christmas visit Green said his visits were being stopped but she did not

explain the reason. He had been visiting for two and a half years straight. On some occasions he would appear for a visit but the children were not there. The last time this happened was in September. Green told him the foster parent was not available. He stopped visiting when his mother became ill and he took care of I.L.M.

A.J.M. was able to do all the services the "first time" but now had a better job with more hours that made it more difficult to do.

During this period, urine and hair samples were taken from appellant to perform drug tests in May and September 2012, March, May, August and October, 2013; and February 2014. (DFPS # 17)

Jeffries testified the October 8, 2013 tests were negative for opiates and alcohol except for the ingestion test that detected cocaine at 1,967 and the exposure test detected cocaine at 2,647. The February 4, 2014 urine test did not detect any drugs or alcohol. However the ingestion extended opiate hair test found cocaine at 1,830 and the ingestion and exposure test only found exposure to marihuana.

Jeffries concluded that A.J.M. is "not a daily user of cocaine" but agreed he used it more than once during the pendency of the case. When asked by the trial court if cocaine was "still a problem for each parent," he answered, the test results are "consistent on low levels . . . it's not a number high in the sky; it's a relatively low number." Jeffries went on to explain that "nobody" could tell if the parents used cocaine four or five times. All that can be said is "[t]hey've done it more than one time." (RR p. 30 & p. 31; L. 1)

On August 26, 2013 appellant was convicted of the class B misdemeanor offense of theft. (DFPS #16)

Evidence Relating to Appellant Before March 27, 2012:

Green testified appellant visited his oldest two children over the course of 2011 and they know who he is. In addition to the information provided in the Yoakum and Harris affidavits, the record shows that specimens were taken from appellant in January and November 2011 as well as January and March 2012.

Jeffries testified the January 2011 urine test detected Xanax at "therapeutic levels . . . if there's a prescription" and chronic marihuana use and "more than one-time" but not chronic cocaine use. The November 2011 test showed cocaine use increased and the alcohol test was negative. The January ingestion hair test showed cocaine at 4.051 picograms and marihuana at 1.0. The March 2012 test revealed that marihuana use was still "heavy" and cocaine was "at 2,119 picograms."

Appellant's criminal record reveals that he was convicted of the following offenses: two charges of the state jail felony offense of possession of a controlled substance on June 3, 1999; the state jail offense of delivery of a controlled substance eon January 30, 2001; the class B misdemeanor offense of possession of marihuana on March 5, 3005; the class B misdemeanor offense of theft on March 10, 2008; the class B misdemeanor offense of possession of marihuana on January 23, 2009; the class A misdemeanor offense of failure to identify oneself to a police officer on January 23, 2009; the class A misdemeanor offense of assault on a family member on May 6, 2010;

32

and, the class B misdemeanor offense of theft on August 26, 2013.

<u>Argument & Analysis</u>

Termination under subsection (E) must be based on more than a single act or omission and requires a voluntary, deliberate, and conscious course of conduct by the parent that endangers the child's physical and emotional well-being. *In re: A.S.*, 261 S.W. 3d at 86

For the reasons set forth above in the discussion of §161.004, appellant submits that the scope of the evidence the Court must consider pertaining to A.A.M. and J.M. is limited to the time period between March 27, 2012 and August 21, 2014 and for I.L.M. it should be limited to the period between December 20, 2012 and August 21, 2014. However, appellant contends that the evidence supporting the subsection (E) termination finding is legally and factually insufficient even when all the evidence adduced at trial is considered.

There is no evidence to show how A.J.M. through his conduct exposed A.A.M. or J.M. to loss or injury or in any way jeopardized them. They were living in a foster home and the father only visited them at the DFPS office. Green testified he was appropriate at those visits.

While appellant tested positive for cocaine and marihuana after March 27, 2012 Jeffries could only concluded that he was not a "daily user of cocaine;" tested positive at "a relatively low number" and used drugs more than one time during the pendency of the case. Similarly, father had one conviction for a class B theft during this period but

the offense was committed on September 14, 2011. There is simply no nexus to explain how these activities endangered his children who were in DFPS conservatorship.

The evidence pertaining to how appellant endangered I.L.M. between December 20, 2012 and August 21, 2014 is scant. A snap shot of this child's condition on December 20, 2012 reveals that he was living with P.M. who was appointed his permanent managing conservator. His parents was named his possessory conservators and allowed supervised visits at all mutually agreeable times.

When P.M. became ill she allowed A.J.M. and his mother to care for their son. Yet there was no evidence that during the unspecified period he stayed with the parents their conduct endangered him. If P.M. had knowingly placed him with persons that endangered his well being DFPS would have been required to remove him rather than placed him back with her.

If the Court finds that DFPS pled for termination of A.J.M.'s parental rights under §161.004 and considers the evidence that was present to the trial court before the respective final orders were signed, DFPS has still failed to meet its evidentiary burden.

To support termination under §161.004 DFPS must prove by clear and convincing evidence the following two elements:

(2) the circumstances of the child, parent, sole managing conservator, possessory conservator, or other party affected by the order denying termination have materially and substantially changed since the date the order was rendered;

(3) the parent committed an act listed under Section 161.001 before the date the order denying termination was rendered;

34

In regard to A.A.M. and J.D. there is insufficient evidence to prove either element. First, there was some evidence that when the children came into DFPS care in 2011 they were out of control and their behavior had improved since being placed in their current foster home in August 2012. Nevertheless, this evidence consisted of conclusory opinions elicited from Green and Smith. *Elizondo v. Krist*, 415 S.W.3d 259, 264 (Tex. 2013) ("bare, baseless opinions will not support a judgment even if there is no objection to their admission in evidence")

Nor is there sufficient evidence to establish the second element in regard to the two oldest children. The only evidence regarding endangering conduct is found in the Yoakum affidavit. While she states on her first visit to the parents' apartment the stove and refrigerator were not working, when she returned the next day she noted it was neat and clean. Moreover, endangering conditions concerns subsection (D) a termination ground that was pled but not found by the trial court. *In re A.S.*, 261 S.W.3d at 83 (explaining that subsection (D) concerns child's environment and subsection (E) concerns parent's conduct)

More importantly, the children did not disclose any abuse nor did Yoakum find any signs of abuse. Appellant disclosed that he had a assault of a family member charge against J.L.D. in 2010. His criminal records indicate it was actually committed on September 14, 2011. In any case, there is no evidence establishing how his criminal acts exposed his children to danger. This is particularly true where, like in this case, most of the acts occurred before the children were born. See *In re E.N.C.* 384 S.W.3d at 804

35

("DFPS bears the burden of introducing evidence concerning the offense and establishing that "the offense was part of a voluntary course of conduct that *endangered the children's well-being* [emphasis added].")

Appellant admitted to Yoakum that he smoked marihuana. He denied knowing that J.L.D. was using drugs. Jeffries testified appellant took his first drug test on January 25, 2011 that revealed chronic marihuana use and "more than one-time" but not chronic cocaine use. Again while there was evidence of drug usage there was no evidence to place it in context - such as when, where and with whom was it consumed? Without such evidence the fact finder could not form a reasonable belief that appellant's use of marihuana and occasionally cocaine exposed his children to danger.

Finally, appellant concedes there was evidence there was evidence that P.M.'s circumstances substantially and materially changed due to her strokes. Nevertheless, he argues that he did not engage in a continuing course of conduct that endangered I.L.M.

The evidence relating to this child before December 20, 2014 is found in the Ballard affidavit. She described the parents' home as "very neat and well kept." She noted the baby bed and bunk beds waiting for the children's return.

Ballard learned new born I.L.M. tested positive for marihuana. Both parents also tested positive for this drug. DFPS however placed the child with P.M. when he was released form the hospital. In fact, the child was never placed with the parents. It is doubt based on the strength of the foregoing evidence the trial court would have terminated appellant's rights on subsection (E) grounds. Certainly, DFPS would not

36

have agreed to appointing appellant as a possessory conservator if there was clear and convincing evidence that his conduct endangered I.L.M.

In conclusion, the Court should find that the evidence is insufficient to support the subsection (E) termination finding.

ISSUE TWO:     WAS THE EVIDENCE LEGALLY AND FACTUALLY
               SUFFICIENT TO SUPPORT THE TERMINATION OF
               APPELLANT'S PARENTAL RIGHTS UNDER §161.001(1)(O)

Applicable Legal Standard

The Family Code provides that a court may order termination of the parent-child relationship if the court finds by clear and convincing evidence that the parent has:

> Failed to comply with the provisions of a court order that specifically establish the actions necessary for the parent to obtain the return of the child who has been in the permanent or temporary managing conservatorship of the Department of Family and Protective Services for not less than nine months as result of the child's removal from the parent under Chapter 262 for the abuse or neglect of the child.

§161.001(1)(O)

Involuntary termination statutes must be "strictly construed" in favor of the parent. *In re E.N.C.*, 384 S.W.3d at 802   §161.001(1)(O) includes a specificity requirement and DFPS is required to "support its allegations against [appellant] by clear and convincing evidence; conjecture is not enough." *In re D.N.*, 405 S.W.3d at 878-79

Argument & Analysis:

Appellant asserts that there is insufficient evidence to support the required element under subsection (O) that the children were removed from appellant under

37

Chapter 262 for the abuse or neglect of the children.

If the relevant time period for A.A.M. and J.M. is limited to between March 27, 2012 and August 21, 2014, there is no evidence that they were removed from appellant under Chapter 262 for the abuse or neglect inflicted upon them. In fact, at all relevant times they were in the permanent managing conservatorship of DFPS. Moreover, there was no evidence that anyone, including appellant, abused or neglect them during this period.

Similarly, I.L.M. was removed from his managing conservator, P.M., due to her illness and inability to care for him. Thus, like his siblings, he was also not removed due to abuse or neglect.

Furthermore, I.L.M. was never in his father's care and therefore could not have been removed from him due to abuse or neglect. Tests conducted at the hospital where the child was born showed he tested positive for marihuana, as did his mother. The parents signed a DFPS safety service plan and agreed to place the child with P.M. While there is evidence that I.L.M. was removed from J.L.D. due to her use of marihuana while pregnant, there is no evidence that A.J.M. knew she was using this drug.

If the Court considers evidence that was presented to the trial court in the case of the oldest two children before March 27, 2012, there was similarly insufficient evidence to show they were removed from appellant due to abuse or neglect.

38

According to the Yoakum affidavit, the children did not disclose any abuse and had no injuries, marks or bruises. She found their apartment to be "clean and neat." The children were appropriately dressed and "did not appear to have any injuries." Moreover, both Green and appellant testified that he completed the FSP in I.L.M.'s case prior to the initial final order being entered.

In conclusion, involuntary termination statutes are strictly construed in favor of the parent. Subsection (O) includes the specific requirement that the child be removed from the parent under Chapter 262 for abuse or neglect to the child. Here the evidence is insufficient to support that element in the case of all three children. Therefore, the subsection (O) termination finding should be reversed.

<u>PRAYER</u>

Appellant, A.J.M., prays that the Court reverse the judgment terminating his parental rights to A.A.M., J.M. and I.L.M. Appellant further prays that this case be remanded to the trial court solely for the purpose of conducting an evidentiary hearing on the issue of conservatorship. Appellant prays for general relief.

Respectfully submitted,

/s/ william m thursland

_____
William M. Thursland
TBN: 20016200
440 Louisiana St., Ste. 1130
Houston, TX 77002
Tel.: (713) 655-0200 x 105; Fax: (713) 655-9035
Email: wmthursland@hotmail.com

Attorney for Appellant, A.J.M.

39

## CERTIFICATE OF COMPLIANCE

I certify that the foregoing computer generated brief complies with word limit requirements of TRAP 9.4 (3). Relying on the word count of the computer program used to prepare this document, the number of words, is 10,385 excluding the caption, identify of parties and counsel, table of contents, index of authorities, statement of the case, statement of issues presented, statement of procedural history, signature, proof of service, certificate of compliance and appendix.

/s/ william m thursland

_____

William M. Thursland

## CERTIFICATE OF SERVICE

I certify that on January 4, 2015 a true and correct copy of the foregoing brief was served in accordance with TRAP on Sandra D. Hachem, Sr. assistant Harris County attorney, 1019 Congress, 17th Fl., Houston, TX 77002, by electronic delivery.

/s/ William. M. Thursland

_____

William M. Thursland