# IN THE SUPREME COURT OF TEXAS

════════════
No. 11-0438
════════════

JOSE L. ELIZONDO AND GUILLERMINA ELIZONDO, PETITIONERS,

v.

RONALD D. KRIST, THE KRIST LAW FIRM, P.C.,
KEVIN D. KRIST, AND WILLIAM T. WELLS, RESPONDENTS

════════════════════════════════════════════════════
ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE FOURTEENTH DISTRICT OF TEXAS
════════════════════════════════════════════════════

**Argued December 5, 2012**

JUSTICE WILLETT delivered the opinion of the Court, in which CHIEF JUSTICE JEFFERSON, JUSTICE GREEN, JUSTICE JOHNSON, JUSTICE GUZMAN, and JUSTICE DEVINE joined.

JUSTICE BOYD filed a dissenting opinion, in which JUSTICE LEHRMANN joined.

JUSTICE HECHT did not participate in the decision.

In this legal-malpractice case, the clients sued their former attorneys, complaining the attorneys had obtained an inadequate settlement. The trial court granted summary judgment for the attorneys, and the court of appeals affirmed. We affirm the court of appeals' judgment.

## I. Background

In March 2005, an explosion occurred at the Texas City refinery of BP Amoco Chemical Company (BP), killing fifteen workers and injuring many others. Approximately 4000 claims were

filed against BP, and BP settled them all. A handful of cases proceeded to trial but settled before a verdict.

Jose Elizondo was working for a BP contractor at the plant on the day of the explosion. The blast threw him about twenty feet. He received medical treatment for neck and back injuries. He returned to work a few days later but claimed he continued to suffer from psychological problems. His wife, Guillermina, claimed that she too suffered, from loss of consortium. Jose met with attorney William Wells and signed a power of attorney retaining Wells to represent him on "all claims I may have against BP and others" arising from the March 2005 explosion.

Wells sent a demand letter to BP asking for a settlement of $2 million on the Elizondos' claims. The settlement demand was made on behalf of both husband and wife.[1] A few months later, an attorney for BP offered to settle "any and all claims of Jose L. Elizondo and his family members" for $50,000. In an effort to increase the settlement in this and three other cases, Wells associated Ronald Krist, Kevin Krist, and the Krist Law Firm as additional counsel. Ronald and Kevin Krist met with BP, but could not obtain a larger settlement for the Elizondos.

Wells and Kevin Krist met with Jose to discuss the settlement offer. They went through a form release prepared by BP. Jose decided to accept the settlement offer and signed the release in February 2006. The release covers Jose and Guillermina, defining the "RELEASORS" as "JOSE

---

[1] The letter begins "Re: Our Clients: Jose Elizondo and spouse Guillermina Elizondo." It states that "Our office represents Jose Elizondo and his wife Guillermina Elizondo" regarding the BP explosion and requests "settlement to the Elizondos" of $2 million. It describes the family life and background of both spouses. It details Jose's physical and psychological injuries. It states that "Mr. Elizondo and his wife have the privilege and responsibility of providing for, nurturing and raising four daughters. The events of March 23rd and following disrupted their family existence and security."

ELIZONDO, GUILLERMINA ELIZONDO, and any of their heirs, executors, agents, trustees, assignees, representatives, attorneys, advisors, administrators, successors and assigns." The release had signature lines for Jose and Guillermina, but only Jose signed it. Guillermina testified that she cannot speak or read English. Jose contends that when he met with his counsel, he asked whether Guillermina needed to sign the agreement and was told it was not necessary.

In August 2007, Jose brought this suit against Wells, Kevin Krist, Ronald Krist, and the Krist Law Firm (the Attorneys). Guillermina was later added as a plaintiff, but all the Attorneys deny ever representing Guillermina. The suit claimed that the Attorneys represented both Elizondos and failed to obtain an adequate settlement on their behalf. The petition asserted claims of professional negligence, breaches of fiduciary duty, and fraud, as well as other claims. It contended that Jose was "sold down the river" so that Ronald Krist could represent BP. After Jose accepted BP's settlement offer, Ronald Krist did represent BP, but he contends his representation of Jose had ended months earlier. The Elizondos also claimed that because Guillermina did not sign the release her claim was never settled, and the Attorneys should have pursued her claim before it became time-barred.

The Attorneys filed several motions for summary judgment on grounds of no evidence of damages, impermissible "claim splitting," and no attorney-client relationship with Guillermina, as well as other grounds. In response to the motions regarding damages, the Elizondos submitted the expert affidavit of attorney Arturo Gonzalez.

The trial court granted some of the summary-judgment motions, including the motions regarding damages. The court of appeals affirmed, holding that because the Elizondos had not

3

presented more than a scintilla of competent evidence of damages, the trial court did not err in granting summary judgment on this ground.[2]

## II.  Discussion

### A.  The Gonzalez Affidavit Did Not Raise a Genuine Issue of Material Fact on Malpractice Damages.

The parties disagree on whether the Gonzalez affidavit was sufficient to defeat summary judgment on the issue of malpractice damages.[3]  Summary judgment was warranted for the Attorneys if, after adequate time for discovery, they demonstrated that the Elizondos had failed to offer competent summary judgment evidence raising a genuine issue of material fact as to damages.[4]

In his eight-page affidavit, Gonzalez recites his general qualifications and his specific involvement in the BP litigation.  He worked for two firms that represented claimants in litigation arising from the plant explosion and was appointed by the 212th district court as plaintiffs' liaison counsel.  He attested that these experiences familiarized him with the settlement of many claims. He stated that BP focused on ten criteria in determining the general value of a case for settlement purposes: (1) proximity to ground zero; (2) when injury was reported to a supervisor; (3) corroboration of proximity and reporting of injuries to supervisor or management; (4) age of victim; (5) wage earning capacity and wage loss (present and future); (6) injuries and bio-mechanics of

---

[2] 338 S.W.3d 17, 24.

[3] The trial court struck certain portions of the affidavit after the Attorneys complained that it was conclusory. Unlike the court of appeals, we do not separately analyze this ruling but address whether the affidavit, considered in its entirety, raised a material issue of fact as to damages.

[4] *See* TEX. R. CIV. P. 166a(i).

injuries—e.g., nature, extent, and duration; (7) medical treatment received and duration thereof (physical and mental/PTSD); (8) surgical versus non-surgical interventions; (9) single or married/residual consortium claims; and (10) onsite versus offsite claims. The affidavit describes the basic facts regarding Jose's injuries, family situation, and work history. It then states:

> Based on the factual information provided and reviewed by me, my experience in the BP litigation, my knowledge of general settlement values and in the criteria and protocol relied upon to establish general settlement values in the BP litigation, it is my opinion that for a plaintiffs' attorney acting within the standard of care applicable to the same or similar circumstances, using reasonable due diligence, the Elizondo case would have had a general value, by way of settlement or verdict, in the range of between Two Million ($2,000,000.00) and Three Million ($3,000,000.00) dollars. Guillermina Elizondo's individual claim would represent some part of that value, but Jose's claim would represent the majority of that value. The settlement value of the Elizondo claim is not distinguished as compensatory, non-economic or exemplary in nature, but instead is a single value offered by BP so that BP could avoid a trial or jury verdict.

The affidavit sets out the information reviewed by Gonzalez and details why, in Gonzalez's opinion, the Attorneys failed to exercise due diligence in their representation of the Elizondos. It then states:

> The settlement offer made by BP for the Elizondos' claim was basically for nuisance value. Given the extraordinary circumstances surrounding the BP explosion[] claims, a reasonably competent plaintiff's lawyer should have continued to prosecute the claim until a fair and reasonable offer was made by BP. In my opinion, had that been done, the Lawyers would have garnered far in excess of the $50,000 offer which was supposedly the most that BP would ever pay.

It then concludes that, in light of the risk of punitive damages in the BP explosion cases, "these cases were heavily evaluated and settlements obtained were significantly higher as compared to the average personal injury lawsuit in the [S]tate of Texas."

5

At the outset, the Attorneys contend that the Gonzalez affidavit is defective because a legal-malpractice suit is a "suit within a suit," and proof of malpractice damages requires proof of what the plaintiff would have recovered by way of a judgment after *trial* absent his attorney's negligence. For example, the Attorneys argue in their brief that plaintiffs alleging malpractice damages "must prove that the 'true value' of their case is a collectible recovery, after a trial, that is greater than the actual result they received," and that "[t]o show the existence of malpractice damages, the Elizondos had to show the *true value* of their claims was greater than what they received, *i.e.*, that they would have recovered by way of judgment an amount greater than they did from BP." They contend that Gonzalez only analyzed why the *settlement* was inadequate for various reasons, and he did not discuss what amount the Elizondos would have recovered if the case had proceeded to judgment after a trial. We disagree with this argument.

We have recognized that in a legal-malpractice case damages consist of "the amount of damages recoverable and collectible . . . if the suit had been properly prosecuted."[5] In *Keck, Mahin & Cate v. National Union Fire Insurance Co.*, we described damages in such cases as the difference between the result obtained and the case's "true value," defined as the recovery that would have been obtained "following a trial" in which the client had "reasonably competent, malpractice-free" counsel.[6]

---

[5] *Cosgrove v. Grimes*, 774 S.W.2d 662, 666 (Tex. 1989); *see also Akin, Gump, Strauss, Hauer & Feld, L.L.P. v. Nat'l Dev. & Research Corp.*, 299 S.W.3d 106, 112 (Tex. 2009).

[6] 20 S.W.3d 692, 703 n.5 (Tex. 2000).

These cases recognize that legal-malpractice damages are the difference between the result obtained for the client and the result that would have been obtained with competent counsel. They do not require that damages can only be measured against the result the client would have obtained if the case had been tried to a final judgment.

In this case, it is undisputed that BP, a large, solvent corporation, made the decision to settle every case arising from the plant explosion. Here, where the same defendant settled thousands of cases, and indeed made the business decision to settle all cases and not try any to a verdict, we see no reason why an expert cannot base his opinion of malpractice damages on a comparison of what similarly situated plaintiffs obtained from the same defendant. This data is perhaps the best evidence of the real-world settlement value of the case. Under Evidence Rule 703, experts may base their testimony on facts or data that are "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject."[7] That test is met when, in a mass tort litigation involving thousands of similar claimants and arising out of the same event, the expert measures the "true" settlement value of a particular case by persuasively comparing all the circumstances of the case to the settlements obtained in other cases with similar circumstances arising from the event.

Nevertheless, the Attorneys argue that the Gonzalez affidavit was conclusory, while the Elizondos maintain that it was sufficiently specific to raise a fact issue on damages.

"Bare, baseless opinions will not support a judgment even if there is no objection to their admission in evidence,"[8] and we have "often held that such conclusory testimony cannot support a

---

[7] TEX. R. EVID. 703.

[8] *City of San Antonio v. Pollock*, 284 S.W.3d 809, 816 (Tex. 2009).

7

judgment."[9] "A conclusory statement of an expert witness is insufficient to create a question of fact to defeat summary judgment."[10] Further, "a claim will not stand or fall on the mere *ipse dixit* of a credentialed witness."[11] Expert testimony fails if there is "simply too great an analytical gap between the data and the opinion proffered."[12] Courts are not required "to ignore fatal gaps in an expert's analysis or assertions."[13] Stated another way, in a legal-malpractice case, we have observed that even where an attorney-expert was qualified to give expert testimony, his affidavit "cannot simply say, 'Take my word for it, I know: the settlements were fair and reasonable.'"[14] Conversely, in this case, an attorney-expert, however well qualified, cannot defeat summary judgment if there are fatal gaps in his analysis that leave the court to take his word that the settlement was inadequate.

Our decision in *Burrow v. Arce* is instructive. In that case as in today's case, attorneys had settled numerous suits in a mass tort proceeding arising out of a plant explosion. The plaintiffs, former clients of the attorneys, contended that the settlements they received were inadequate for various reasons, including the failure of the attorneys to "fully investigate and assess individual claims."[15] The trial court granted summary judgment for the attorneys on grounds that the

---

[9] *Coastal Transp. Co. v. Crown Cent. Petroleum Corp.*, 136 S.W.3d 227, 232 (Tex. 2004).

[10] *McIntyre v. Ramirez*, 109 S.W.3d 741, 749–50 (Tex. 2003).

[11] *Burrow v. Arce*, 997 S.W.2d 229, 235 (Tex. 1999).

[12] *Gammill v. Jack Williams Chevrolet, Inc.*, 972 S.W.2d 713, 726 (Tex. 1998) (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)).

[13] *Volkswagen of Am., Inc. v. Ramirez*, 159 S.W.3d 897, 912 (Tex. 2004).

[14] *Burrow*, 997 S.W.2d at 236.

[15] *Id.* at 232.

8

settlements were fair and reasonable and therefore the clients had suffered no actual damages and were not entitled to the forfeiture of fees they sought.[16]

We held that the affidavits submitted by the attorneys were conclusory and therefore insufficient to entitle the attorneys to summary judgment. We considered three affidavits. The most detailed affidavit, from retained expert-attorney Malinak, set out numerous criteria that were important in evaluating settlements in the case, including the underlying liability facts, the identity of the employer, the elements of damages available to each plaintiff, and the losses to each plaintiff.[17] The expert then declared that he had evaluated the criteria as to each plaintiff and had concluded that the settlement as to each was reasonable and fair.[18] We held that the affidavit was too conclusory to sustain a summary judgment on the element of damages:

> The affidavit says no more than that Malinak, an experienced attorney, has considered the relevant facts and concluded that the Clients' settlements were all fair and reasonable. . . . Credentials qualify a person to offer opinions, but they do not supply the basis for those opinions. The opinions must have a reasoned basis which the expert, because of his "knowledge, skill, experience, training, or education [,"] is qualified to state. That basis is missing in Malinak's affidavit. He does not explain why the settlements were fair and reasonable for each of the Clients. His affidavit . . . is nothing more than a sworn denial of plaintiffs' claims and no more entitles the Attorneys to summary judgment than a lawyer's equally conclusory affidavit stating that the Clients had suffered $10 million damages would entitle them to summary judgment. . . . [T]he issue is whether Malinak's affidavit states a sufficient basis for his opinions. Malinak might have analyzed the Clients' injuries by type, or related settlement amounts to medical reports and expenses, or compared these settlements to those of similar claims, or provided other information showing a relationship between the plaintiffs' circumstances and the amounts received. He

---

[16] *Id.* at 233.

[17] *Id.* at 235.

[18] *Id.*

9

did not do so. The absence of such information did not merely make the affidavit unclear or indirect; it deprived Malinak's opinions of any demonstrable basis. We therefore conclude that summary judgment could not rest on Malinak's affidavit.[19]

The Gonzalez affidavit in today's case is similarly conclusory. Like the Malinak affidavit, the Gonzalez affidavit is from an experienced attorney whose credentials are not the problem. The problem is the lack of a demonstrable and reasoned basis on which to evaluate his opinion that the settlement was inadequate. Like the Malinak affidavit, the Gonzalez affidavit explains in some detail the factors or criteria that should inform a determination of the value of the case. Like the Malinak affidavit, the Gonzalez affidavit confirms that the affiant considered the facts relevant to the case, but it fails to offer specifics on why the value of the case was $2–3 million as opposed to the $50,000 received in settlement. A fatal analytical gap divides the recitation of the facts of the Elizondo case and the declaration of its settlement value.

Gonzalez did not evaluate what the Elizondo case would have yielded by way of a judgment if the case had gone to trial. On the contrary, he based his opinion on what the Attorneys should have obtained in *settlement*. The affidavit makes clear throughout that Gonzalez's opinion of the value of the case stems from his opinion of the settlement the Attorneys should have obtained. As noted above, none of the approximately 4000 claims arising from the BP plant explosion was tried to a verdict. Gonzalez states in the affidavit that through his experience he gained knowledge of the "settlement ranges or case values" in the BP litigation. He then lists the criteria BP used in "determining the general value of a case for settlement purposes." He states his value of the case

---

[19] *Id.* at 235–36 (quoting TEX. R. EVID. 702).

10

based on his "knowledge of general settlement values and . . . the criteria and protocol relied upon to establish general settlement values." He states that "[t]he settlement offer made by BP . . . was basically for nuisance value" and that, given the extraordinary circumstances of the BP plant explosion, "a reasonably competent plaintiff's lawyer should have continued to prosecute the claim until a fair and reasonable offer was made by BP." He concludes by stating that the Attorneys could have "greatly enhanced the settlement value of the Elizondo claim" by developing facts supporting exemplary damages. As explained above, we conclude that an analysis of settlements of cases with injuries and circumstances similar to the Elizondo case *might* be sufficient to raise a fact issue as to the inadequacy of the settlement, but Gonzalez did not undertake to compare the Elizondo settlement with other actual settlements obtained in the BP litigation. As in *Burrow*, the expert might have compared this settlement "to those of similar claims, or provided other information showing a relationship between the plaintiffs' circumstances and the amounts received [but he] did not do so."[20] We are simply left to take his word that the settlement here was inadequate. In this regard, we agree with the court of appeals:

> [A]lthough Gonzalez lists specific criteria he contends BP "focused on" when determining settlement values, he offers no analysis to explain how these factors would be applied to the Elizondos' situation. He also fails to link settlement amounts to specific injuries and circumstances, and provides no comparison of settlement amounts of similar claims. Thus, Gonzalez's affidavit offers only conclusory and speculative opinions.[21]

---

[20] *Id.* at 236.

[21] 338 S.W.3d at 21–22.

We conclude, therefore, that the affidavit did not raise a genuine issue of material fact sufficient to defeat summary judgment.

The dissent reasons that the affidavit raised a fact issue on whether competent counsel would have obtained a settlement in excess of $50,000, which Gonzalez characterized as nuisance value. We differ because, for the reasons stated, the affidavit was devoid of a demonstrable basis, whether we consider that portion of the affidavit claiming the case had a settlement value of $2–3 million, or that portion declaring the settlement value was "far in excess of the $50,000" actually received. These assertions are equally conclusory, suffer from the same fatal gap in analysis, and, as in *Burrow*, rely on nothing more than the *ipse dixit* of the expert. We are simply left to take the expert's word as to the adequacy of the settlement, the same defect we recognized in *Burrow*.

### B. Discovery Disputes in the Trial Court Did Not Warrant Denial of the Summary Judgment Motions on Damages.

The court of appeals dissent noted that at various points in the litigation the Lawyers objected to the discovery of information about other settlements, and this dissent thought it "fundamentally unfair for the Lawyers to thwart discovery as to other settlements and at the same time use the lack of that information to strike Gonzalez's affidavit."[22] It noted that "[t]he Elizondos asked for a court order to allow Gonzalez to reveal specifics from the BP settlements, and the Lawyers opposed the order."[23] On the other hand, the court of appeals majority concluded that the Elizondos did not assign as error on appeal that the trial court erred in denying their request to obtain discovery on or

---

[22] *Id.* at 28 (Christopher, J., concurring and dissenting).

[23] *Id.* (footnote omitted).

otherwise reveal information regarding settlements in other cases.[24] On this issue, we ultimately are not persuaded by the court of appeals dissent—essentially urging that, because the Lawyers objected to discovery regarding other settlements, the Lawyers should be estopped from prevailing on grounds that the Gonzalez affidavit was inadequate. Nevertheless, we find the issue difficult and discuss it at some length herein.

The settlement agreements in the BP cases contained a confidentiality provision prohibiting disclosure of the details of the settlements to third parties. The Elizondos' expert, Gonzalez, stated in his affidavit that he was bound by this provision. The Attorneys were also bound by this provision.[25] To the extent the Attorneys contended as an initial discovery response that they and others could not disclose information regarding other settlements for contractual reasons, we believe they argued within the bounds of zealous advocacy in contending that the information should not be disclosed even if it might be helpful to the Elizondos.

---

[24] The court of appeals majority noted:

> The Elizondos sought to obtain discovery regarding various documents relating to the BP settlements and, in response, the Lawyers asserted various objections. The Elizondos also asked for a court order under which Gonzalez could reveal specific information regarding the BP settlements, and the Lawyers opposed this motion. But, the Elizondos have not asserted on appeal that the trial court sustained the Lawyers' discovery objections or denied this motion, and the Elizondos have not cited any place in the record in which the trial court made any ruling in this regard. In addition, the Elizondos have not assigned error or presented argument challenging any such ruling by the trial court.

*Id.* at 21 n.2 (majority opinion).

[25] The Elizondo release applies to the Elizondos and their attorneys and other agents, and provides: "The parties agree to keep confidential and not to disclose to third parties any of the consideration paid under this Agreement or any of the other terms of this Agreement, except that any party may disclose such portions of the Agreement, and to such limited extent, as may be necessary for obtaining tax or legal advice or as may be required by law or court order."

13

Further, we can find no place in the record where the Elizondos contended that their expert needed to review and reveal information about other specific settlements in order to prepare a valid expert opinion. The voluminous record before us indicates several pretrial skirmishes where other settlements came up.[26] But the Elizondos point to nothing in the record indicating that, but for objections raised by the Attorneys, Gonzalez would have augmented his affidavit with a more revealing analysis and comparison of other specific settlements obtained in similar cases. On the contrary, he stated in his affidavit that "I am precluded pursuant to the confidentiality provisions from divulging specific settlement amounts related to the monetary payments by BP to specific plaintiffs." Gonzalez did not indicate that he wished to analyze and describe other specific settlements to buttress his opinion but had been thwarted by the objections of the Attorneys.

In addition, the Elizondos did not ask the trial court to defer ruling on the summary judgment motions until they could obtain from the Lawyers or third parties evidence of other settlements. The Elizondos should have made such a request if they thought their expert needed this data.[27] Moreover, they do not even now contend that they needed discovery of other settlements so that Gonzalez could provide a comparison of them in opining on the adequacy of the Elizondo settlement. In their

---

[26] For example, the Elizondos sought from the Lawyers production of settlement documents of other BP explosion clients and sought production of settlement documents from third-party law firms who had represented BP. They also sought the production of any matrix or grid used by BP in valuing claims. The Lawyers raised various objections to these requests.

[27] *See* Tex. R. Civ. P. 166a(g) ("Should it appear from the affidavits of a party opposing the [summary judgment] motion that he cannot for reasons stated present by affidavit facts essential to justify his opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just."); *Tenneco Inc. v. Enter. Prods. Co.*, 925 S.W.2d 640, 647 (Tex. 1996) ("When a party contends that it has not had an adequate opportunity for discovery before a summary judgment hearing, it must file either an affidavit explaining the need for further discovery or a verified motion for continuance.").

14

principal brief, they argue to us only that the Lawyers' refusal to produce information about other settlements should lead us to hold "that the trial court abused its discretion in striking portions of Gonzalez's affidavit." As detailed above,[28] even if we consider the entire Gonzalez affidavit, including the portions struck by the trial court, we still conclude that it failed to raise a material issue of fact as to damages.

As noted above, the Elizondos filed a motion, mentioned by the court of appeals majority and dissent, seeking a trial court order allowing Gonzalez to reveal information regarding other settlements under a proposed protective order.[29] But from the record before us the Attorneys were not actually opposing such disclosures.[30] In fact, the motion sought entry of an order allowing Gonzalez to testify in his deposition about other settlements because the Elizondos anticipated that *the Lawyers* would ask about these other settlements.[31] Gonzalez sought a court order because the settlement agreements authorized disclosure of settlement amounts if "required by law or court order."

---

[28] *See supra* note 3 and Part II.A.

[29] *See supra* notes 23–24 and accompanying text. The protective order would have limited disclosure to this lawsuit only.

[30] The court of appeals majority and dissent perhaps noted that the Lawyers opposed the motion because the certificate of conference to this motion stated that counsel for the two sides "have been unable to work out any resolution of this motion," and that counsel for Kevin Krist was unavailable and would likely oppose the relief requested.

[31] The motion states: "The Lawyer Defendants have made it clear that they intend to inquire of Mr. Gonzalez, or seek documents from him, regarding the specific amounts paid by BP to settle other similar claims . . . as referenced by Mr. Gonzalez in his affidavit. Plaintiffs are more than willing for such information to be disclosed, but want to do so in a way that limits disclosure to *this* lawsuit only and for no other use or purpose. Likewise, Mr. Gonzalez has advised that he is willing to disclose such information under a fair protective order."

In several pleadings in our record the Elizondos requested a continuance or more discovery before the trial court ruled on the summary judgment motions. These requests met with some success, in that the trial court agreed not to set a hearing on the summary judgment motions until two weeks after the depositions of the Lawyers were taken. In a motion for continuance filed in April 2008, the Elizondos contended that they needed settlement-related documents pertaining to other BP clients of the Lawyers. However, this pleading disclaimed any need for information regarding the amounts of other settlements, stating that the Elizondos were content with redaction of settlement amounts if that information raised confidentiality concerns[32] and that the Attorneys' summary judgment motions on damages were based on a "faulty premise," namely that the "only way of proving damages is by showing that someone else with identical injuries and claims against BP received a larger settlement." A pleading styled "Demonstration of Need for Additional Discovery Prior to Hearing on Defendants' Sixteen Motions for Summary Judgment," also filed in April 2008, stated that the Elizondos needed settlement documents related to other BP clients of the Lawyers, but the stated need was to refute the Lawyers' contention that they did not represent Guillermina, the wife of the plaintiff directly injured in the blast. At least two other pleadings—plaintiffs' April 2008 motion for continuance and a March 2008 motion to compel production of documents—made the same argument. Again, the Demonstration of Need disclaimed any need for discovery of the amounts of the other settlements, stating that "Plaintiffs would not object to limited redactions

---

[32] The motion states: "The only apparent confidentiality concern raised by anyone concerns the 'confidential' settlement amounts paid to injured BP claimants, as set out in settlement/release agreements. This concern does not apply to any settlement demand made by a plaintiff's lawyer to BP's defense counsel. To the extent the concern is legitimate in regard to any settlement/release agreement, the Court can permit the producing party to redact any actual settlement amounts and thereby protect confidentiality."

16

necessary to comply with confidentiality provisions, such as dollar amounts . . . ."[33]  Another motion for continuance, filed in October 2008 and relating specifically to the summary judgment motions on damages, made no request for additional discovery on settlements in other cases.  It contended, on the contrary, that the Gonzalez affidavit was adequate to refute all the Lawyers' arguments in favor of summary judgment on grounds that no evidence had been presented on damages, including the Lawyers' argument that "Plaintiffs cannot identify anyone who obtained a larger settlement for the same claims, much less the amount received, which demonstrates that Plaintiffs cannot prove damages."  It asked for a continuance only if the Court was considering granting summary judgment on grounds that Guillermina had no consortium claim because Jose's injuries were not sufficiently "serious, permanent, and disabling," grounds unrelated to the alleged inadequacy of the Elizondo settlement that might be revealed by an expert comparison of other BP settlements.

In sum, none of these discovery skirmishes indicate that the Elizondos took the position in the trial court that (1) discovery of the dollar amount of other settlements in similar cases was needed so their expert could make a valid, non-conclusory determination of the adequacy of the Elizondo settlement or better describe his analysis, and (2) consideration of the summary judgment motions on damages should be continued until such discovery was provided.  Accordingly, we do not agree with the court of appeals dissent insofar as it would hold that the Lawyers were not entitled to summary judgment because of their attempts to limit discovery regarding other settlements.

---

[33] The March 2008 motion to compel similarly states that "Plaintiffs are willing to allow Defendants to redact the actual dollar amounts contained in any demands and in any settlement/release agreements signed by their other clients, so Defendants have no basis to object on these purported confidentiality grounds."

### C. The Lay Testimony of the Elizondos Did Not Raise a Genuine Issue
### of Material Fact on Malpractice Damages.

The Elizondos contend that their own deposition testimony raised fact issues as to damages sufficient to defeat summary judgment. Jose testified about his pain and suffering, and Guillermina testified about her loss of consortium. The Elizondos contend that these unliquidated damages are best left to a jury and that summary judgment therefore was not warranted.

We agree with the Lawyers that even if the Elizondos presented some evidence of actual damages, this does not mean they raised a material issue of fact as to *malpractice* damages. The two are not the same here, because the case settled for $50,000. Even if the Elizondos suffered some compensable damages, they suffered as a result of the Attorneys' conduct only if, absent malpractice, they probably would have recovered a settlement for more than $50,000. As explained above, the general measure of damages in a legal-malpractice case is the difference between the amount the plaintiff probably would have recovered in the absence of malpractice, and the amount recovered. While a "suit within a suit" analysis is not required in a case like this one, for the reasons explained, the alternative method available to establish attorney-malpractice damages requires an analysis of settlements made under comparable circumstances. While this alternative method is sometimes available, we conclude that such an analysis requires expert testimony. We have in the past noted that proof of attorney malpractice requires expert testimony, because establishing such negligence requires knowledge beyond that of most laypersons.[34] The same is true of proof of damages under

---

[34] *See Alexander v. Turtur & Assocs., Inc.*, 146 S.W.3d 113, 119–20 (Tex. 2004) (noting that "the wisdom and consequences" of "tactical choices made during litigation are generally matters beyond the ken of most jurors" and that "when the causal link is beyond the jury's common understanding, expert testimony is necessary").

a theory that a settlement was inadequate. The Elizondos' own expert attested that a calculation of a reasonable settlement in this case required an analysis of at least ten factors considered by BP in determining settlement values, a balancing and evaluation of which is surely "beyond the ken of most jurors."[35] We conclude that even these factors are inadequate if considered in a vacuum without evaluation of settlements of comparable cases. Given the complexity of these factors, we conclude that such an analysis requires expert testimony. It cannot be based solely on the testimony of the claimants, particularly where Jose testified that he did not know the value of his claim, he testified that he had "no idea" of the value of his wife's claim, and both husband and wife testified that they did not know whether anyone had received a larger settlement in a case involving similarly situated claimants.

The Elizondos also argue that summary judgment was not warranted as to Guillermina because she recovered nothing. They argue that Guillermina did not sign the release and therefore still had an unsettled claim, and that she received nothing in the settlement. The parties disagree on whether the Lawyers ever represented Guillermina. But even if Guillermina is correct that the Lawyers represented her and had a duty to obtain a settlement for her, or at least advise her that her claim should be pursued before limitations ran, we cannot agree that she raised a fact issue on damages in light of the Elizondos' own evidence proffered in response to the summary judgment motions. The Elizondos offered proof that (1) William Wells advised BP that he represented Jose and Guillermina and made a settlement demand on behalf of both husband and wife; (2) BP

---

[35] *Id.* at 119.

19

responded with a settlement offer to settle "all claims of Jose L. Elizondo and his family" for $50,000; (3) the settlement offer was accepted, and BP drafted a release to be signed with disbursement of the settlement proceeds, defining the "releasors" to include both Jose and Guillermina; (4) the release had signature lines for both husband and wife; (5) Jose alone met with Wells and Kevin Krist to go over the release; (6) Jose was told that Guillermina (who could not speak or read English) did not need to sign the release; and (7) Jose signed the release and received the settlement proceeds. To prevail under the theory that Guillermina received nothing on her claim of loss of consortium, she would have to prove that her claim survived the release because Jose did not have authority to sign the release and accept the settlement proceeds on behalf of both of them, and that she and her lawyers tricked BP into paying $50,000 to settle both claims and BP remained liable on the loss of consortium claim. She would also have to prove that BP could have been persuaded to pay an additional settlement or a trier of fact could have been persuaded to award additional damages in such unsavory circumstances. We have reviewed the record and conclude that Guillermina failed to proffer evidence, expert or otherwise, upon which a reasonable and fair-minded trier of fact could have found damages for her under such a novel theory.[36]

### III. Conclusion

We affirm the court of appeals' judgment.

---

[36] *See Goodyear Tire & Rubber Co. v. Mayes*, 236 S.W.3d 754, 755 (Tex. 2007) ("An appellate court reviewing a summary judgment must consider whether reasonable and fair-minded jurors could differ in their conclusions in light of all the evidence presented.").

_____
Don R. Willett
Justice

**OPINION DELIVERED:** August 30, 2013