**AFFIRM; and Opinion Filed July 3, 2019.**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

## No. 05-18-00467-CV

**LARRY GREB, Appellant**
**V.**
**BRET MADOLE AND CARRINGTON, COLEMAN, SLOMAN & BLUMENTHAL, LLP,**
**Appellees**

On Appeal from the 134th Judicial District Court
Dallas County, Texas
Trial Court Cause No. DC-16-12734

## MEMORANDUM OPINION

Before Justices Myers, Molberg, and Carlyle
Opinion by Justice Molberg

Larry Greb appeals the trial court's take-nothing summary judgment in favor of his former

attorneys, Bret Madole and Carrington, Coleman, Sloman & Blumenthal, LLP (Carrington

Coleman) (collectively, Attorneys), on his claims for negligence, gross negligence, and breach of

fiduciary duty in a lawsuit stemming from Attorneys' alleged non-disclosure of a conflict of

interest between Greb, Greb's then-business partner, and their jointly-owned business. In three

issues, Greb contends the trial court erred by granting summary judgment and by dismissing his

claims with prejudice, because the summary judgment evidence raised a genuine issue of material

fact as to: (1) whether Attorneys' negligence was the proximate cause of Greb's damages, (2)

whether Greb suffered damages as a result of Attorneys' negligence, and (3) whether Carrington

Coleman breached its fiduciary duty to Greb.

The principal question before this Court is whether Greb raised a genuine issue of material fact on the causation element of his claims. We conclude he did not. Accordingly, we affirm the trial court's judgment.

**Background**

We recount the complicated history of the dispute subject of this appeal only as necessary to resolve the question of whether the trial court properly granted summary judgment on Greb's claims for legal malpractice and breach of fiduciary duty.

Over fifteen years ago, Greb and Rick Johnson became co-owners of a conglomeration of business enterprises and entities (collectively, J&G).[1] To secure loans from Citizens National Bank of Waxahachie (CNB) on behalf of J&G (CNB Notes), Greb and Johnson granted liens on J&G's assets. Greb and Johnson also executed personal guaranties for J&G's debt, and Greb pledged his personal assets—two ranches and an apartment complex—as collateral for the loans.

J&G defaulted on the CNB Notes, and in April 2014, Johnson engaged Carrington Coleman and Bret Madole[2] to represent J&G, Greb, and Johnson in a lawsuit against CNB, who was seeking to foreclose on J&G's assets as well as Greb's personal assets. Attorneys filed suit against CNB (CNB lawsuit), seeking a temporary restraining order (TRO) to enjoin the foreclosure while Greb and Johnson attempted to sell J&G or secure re-financing of their debt to CNB. After the trial court granted the TRO, the parties entered into a "stand-still" agreement, under which CNB agreed to stay action on the foreclosure. The stand-still agreement was extended by a series of rule 11 agreements, which, in toto, gave Greb and Johnson fifteen months to sell J&G or obtain re-financing.

---

[1] Greb owned sixty percent, and Johnson owned forty percent, of J&G.

[2] Madole was Johnson's personal attorney, and he later joined Carrington Coleman as a partner. At Carrington Coleman, Madole represented Greb, Johnson, and J&G in their lawsuit against CNB.

Greb and Johnson attempted to sell J&G to several companies. In June 2014, Greb and Johnson signed a letter of intent to sell J&G to AuSable Capital Partners (AuSable) for $20 million. The AuSable deal fell through when AuSable lowered the purchase price to $15 million, which Greb believed to be "significantly" less than J&G's value.

In 2013, 2014, and 2015, Greb contacted Hanson Building Products (Hanson)—which later changed its name to Forterra—to discuss a sale of J&G.[3] The summary judgment evidence reflects that Forterra and Greb were unable to agree on a purchase price because of a "huge" gap in their respective assessments of J&G's value. E-mails indicate that in September 2015, Forterra was willing to pay approximately $20 million for J&G, and Greb was asking $35 million.[4] Greb told Forterra that a purchase price "in the $20 million range" would not "work for him." Forterra did not make a formal offer or enter into a letter of intent to purchase J&G, and ultimately, Forterra "[took] a pass" on purchasing J&G.

In May 2015, Greb and Johnson signed a letter of intent to sell J&G to Baymark Partners (Baymark) for approximately $15 million. James Patterson of the law firm Hierche, Hayward, Drakely & Urbach (HHDU) represented Greb on the Baymark transaction.[5] On July 30, 2015, Baymark provided a draft Asset Purchase Agreement (Baymark APA) to Madole, who forwarded it to Patterson and Greb. Patterson reviewed and made substantive changes to the Baymark APA on behalf of Greb. The summary judgment evidence shows Patterson also communicated

---

[3] In 2015, Hanson changed its name to Forterra following the sale of the company to Lone Star Funds, an investment group (Lone Star). Any reference to Forterra in this opinion also refers to Hanson and/or Lone Star, as applicable, and vice versa.

[4] In a January 2018 deposition, Plamen Jordanoff, the former CEO of Hanson, testified Hanson valued J&G "in the $20 million or sub-$20 million range in September of 2015." After his deposition, Jordanoff signed a declaration indicating the value of J&G increased in 2016, stating, "the purchase of J&G by Forterra would likely have occurred in 2016 because the company was worth around $30 million to Forterra regardless of who owned J&G in 2016."

[5] Greb signed an engagement with HHDU on December 10, 2014, to represent him "regarding the analysis of the governance provisions of all documents of [Greb's] entities, with a focus on transferability and consent obligations of the owners," and any other matters specified by Greb.

–3–

extensively with Madole regarding Greb's revisions. As it relates to Greb, the Baymark APA provided Greb would receive $2,350,000 in cash at closing; Baymark would assume the indebtedness owed to CNB, which totaled approximately $11 million; and CNB would release Greb from his personal guaranty and the liens on his personal assets.

Baymark planned to obtain loans from Comerica and Texas Capital Bank to finance its purchase of J&G. After signing the Baymark APA, Greb contacted Comerica and Texas Capital Bank and informed them he "did not know who Baymark was," and he had not entered into a letter of intent to sell J&G to Baymark.[6] After a conversation with Comerica, Baymark understood Greb made these misrepresentations in an attempt to obtain re-financing. When CNB learned of Greb's false representations to Comerica and Texas Capital Bank, it filed an application for a TRO seeking, among other things, to enjoin Greb from making false statements to third parties regarding the purchase of J&G. Greb opposed CNB's application for the TRO, and Johnson did not oppose it, creating a conflict of interest between Greb and Johnson. As a result, on August 20, 2015, Attorneys informed Greb, Johnson, and Patterson they did not "represent any of the Principals in their individual capacities" in the CNB lawsuit or in the Baymark transaction. Attorneys also requested to withdraw as counsel for all parties in the CNB lawsuit, including J&G, after the August 21, 2015 hearing on CNB's application for a TRO against Greb. HHDU entered an appearance in the CNB lawsuit on August 21, 2015, and HHDU represented Greb at the hearing. At the conclusion of the hearing, the trial court granted the TRO against Greb, and granted Attorneys' motion to withdraw as counsel from the CNB lawsuit. The TRO prohibited Greb from

---

[6] At his deposition, Greb testified, "I told [Comerica] I wasn't under an LOI that would prevent me from refinancing." Greb admitted he informed Comerica he "did not know who Baymark was." A Baymark representative testified that Greb told Comerica that he "was not under an LOI and did not know who Baymark was." According to Ludlow, Comerica and Texas Capital Bank did not finance Baymark's purchase of J&G as a result of Greb's misrepresentations.

seeking re-financing or seeking a buyer for J&G without the express authorization of the Board of Directors.

On August 22, 2015, Patterson e-mailed Madole a "Term Sheet detailing [Greb's] agreement for moving forward with the Baymark transaction." Greb and Johnson executed the Term Sheet on August 25 and 26, 2015, respectively. Baymark, Greb, and Johnson signed the Baymark APA on August 28, 2015, and the sale closed at the end of September 2015.

The summary judgment evidence included the expert report, affidavit, and excerpts from the deposition transcript of Randal Johnston, Greb's expert witness. At his deposition, Johnston agreed the rule 11 agreements negotiated by Attorneys "gave Mr. Greb a significant amount of time" to "either sell the assets, sell the companies, or get refinancing." According to Johnston, "the effect of these Rule 11 agreements [was] to in effect have an injunction [preventing foreclosure] for 15 months to allow [Greb] to work this out," which "[u]nquestionably" was "to Mr. Greb's benefit." Greb, however, was unable to secure re-financing, and Johnston was not "aware of any offers to buy the company that Mr. Greb was willing to accept other than" the AuSable and Baymark offers.

Johnston opined, "[Attorneys] violated the standard of care by not early on disclosing potential conflicts of interest so that the clients could make an informed decision of joint representation. I see evidence that persuades me that they surrendered to those conflicts of interest and gave a preference to Mr. Johnson." According to Johnston, "the harm or the danger [that] was caused by this so-called conflict of interest, if it occurred and they surrendered and so forth, is that Mr. Greb was deprived of having his own lawyer to advise him." However, Johnston conceded that determining whether Greb had independent counsel "only makes a difference if having an independent counsel would have resulted in a different outcome."

With respect to the Baymark transaction, Johnston confirmed that to establish damages, Greb would "have to show that there was a buyer willing to pay more than [Baymark paid]." According to Johnston, "if there is harm caused to Mr. Greb, then it is in my opinion I'll say solely, and that's an awfully broad statement . . . he would have received more than he got under [the Baymark] APA and these agreed terms." With respect to the CNB lawsuit, Johnston attested that he would not "rende[r] an opinion on the outcome of that trial if it had gone forward." While Johnston "opin[ed] as an expert witness" that the claims asserted by Greb, Johnson, and J&G in the CNB lawsuit "more likely than not" had "a real chance of success," he declined to conclude they would have prevailed, declaring, "I'm not gonna testify that they would have won. I haven't gone that far." Johnston further equivocated on the issue of proximate cause, predicating, "we are not in disagreement over the fact that unless [Greb] can demonstrate that independent counsel would have resulted [in] him having a more favorable result, he's going to be unable to satisfy his proximate cause component and . . . that's something I can't opine on."

While Johnston's expert report concluded Attorneys' "breach of the standard of care and their breach of fiduciary duty were a proximate cause of financial damages to Mr. Greb," Johnston confirmed he had "no firsthand knowledge of the damages." Johnston limited his opinion to his belief that the "nature and character of the damages alleged by Mr. Greb are of the type that would be proximately caused by the acts of negligence and malfeasance he describes in the First Amended Petition."

**Procedural History**

Greb sued Attorneys in 2015 and he filed a second amended petition on March 16, 2018. Greb alleged that Attorneys owed conflicting duties to Greb, Johnson, and J&G; they failed to disclose the conflict of interest; they continued to represent Greb and Johnson to collect legal fees; and they protected Johnson's interests over Greb's interest, to Greb's detriment, in the CNB

–6–

lawsuit and in the Baymark transaction. Greb further alleged that after Attorneys withdrew as counsel in the CNB litigation, they continued to represent Johnson in the Baymark transaction, "effecting and completing the deal that squeezed Larry Greb out of his company while retaining for Rick Johnson his full interest in the company." Greb asserted claims against Attorneys for negligence, gross negligence, and breach of fiduciary duty. As remedies, Greb sought actual damages, punitive damages, disgorgement of fees paid to Carrington Coleman, and Greb's legal fees resulting from Attorneys' breach of fiduciary duty.

Attorneys filed a no-evidence motion for summary judgment on all of Greb's claims, arguing: (1) Greb was represented by independent counsel at all relevant times, (2) there was no evidence that any alleged breach was the proximate cause of Greb's alleged harm, (3) there was no evidence Greb sustained damages, and (4) Greb's breach of fiduciary duty claim was an impermissible attempt to fracture his negligence claim. The trial court granted Attorneys' summary judgment motion without specifying the grounds upon which it was granted, ordered that Greb take nothing on his claims against Attorneys, and dismissed Greb's claims against Attorneys with prejudice. This appeal followed.

**Standard of Review**

We review a trial court's grant of summary judgment de novo. *Travelers Ins. Co. v. Joachim*, 315 S.W.3d 860, 862 (Tex. 2010). In a no-evidence motion for summary judgment, the movant must state the elements of each attacked claim for which there is no evidence. *See* TEX. R. CIV. P. 166a(i). The burden then shifts to the non-movant to adduce evidence raising a genuine issue of material fact supporting the challenged elements of the plaintiff's claims. *Id.*; *see also King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 750–51 (Tex. 2003). We review the summary judgment evidence in the light most favorable to the non-movant, crediting evidence favorable to

the non-movant if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not. *Mack Trucks, Inc. v. Tamez*, 206 S.W.3d 572, 582 (Tex. 2006).

A no-evidence motion for summary judgment must be granted if: (1) the movant asserts there is no evidence of one or more specified elements of a claim or defense on which the adverse party would have the burden of proof at trial, and (2) the non-movant produces no summary judgment evidence raising a genuine issue of material fact on those elements. *See* TEX. R. CIV. P. 166a(i). If the non-movant provides more than a scintilla of probative evidence raising a genuine issue of material fact on each challenged element, a no-evidence summary judgment is improper. *Smith v. O'Donnell*, 288 S.W.3d 417, 424 (Tex. 2009). Evidence that fails to constitute more than a mere scintilla is, in legal effect, no evidence at all. *Lozano v. Lozano*, 52 S.W.3d 141, 145 (Tex. 2001). When, as here, the trial court's order does not specify the grounds upon which it granted summary judgment, we affirm the judgment if any of the theories asserted in the motion are meritorious. *Carr v. Brasher*, 776 S.W.2d 567, 569 (Tex. 1989).

### Legal Malpractice

Attorneys owe their clients the duty to act with ordinary care, *i.e.*, in a manner consistent with the standard of care expected to be exercised by a reasonably prudent attorney. *See Cosgrove v. Grimes*, 774 S.W.2d 662, 664 (Tex. 1989). This "standard is an objective exercise of professional judgment, not the subjective belief that [the attorney's] acts are in good faith." *Cosgrove*, 774 S.W.2d at 664. A legal malpractice claim complaining about an attorney's care, skill, or diligence in representing a client sounds in negligence. *See Cosgrove*, 774 S.W.2d at 664; *see also Kimleco Petroleum, Inc. v. Morrison & Shelton*, 91 S.W.3d 921, 924 (Tex. App.—Fort Worth 2002, pet. denied) ("Regardless of the theory a plaintiff pleads, as long as the crux of the complaint is that the plaintiff's attorney did not provide adequate legal representation, the claim is one for legal malpractice.").

To recover on a claim for legal malpractice, the plaintiff must show: (1) the attorney owed the plaintiff a duty, (2) the attorney breached that duty, (3) the breach proximately caused the plaintiff's injuries, and (4) damages occurred. *Alexander v. Turtur & Assocs., Inc.*, 146 S.W.3d 113, 117 (Tex. 2004). "Breach of the standard of care and causation are separate inquiries, and an abundance of evidence as to one cannot substitute for a deficiency of evidence as to the other." *Thompson & Knight LLP v. Patriot Exp., LLC*, 444 S.W.3d 157, 163 (Tex. App.—Dallas 2014, no pet.). Proximate cause is usually a question of fact in a legal malpractice action; however, it may be determined as a matter of law if the circumstances are such that reasonable minds could not arrive at a different conclusion. *Swinehart v. Stubbeman, McRae, Sealy, Laughlin & Browder, Inc.*, 48 S.W.3d 865, 875 (Tex. App.—Houston [14th Dist.] 2001, pet. denied) (op. on reh'g). Proximate cause has two elements: cause in fact and foreseeability. *W. Invs., Inc. v. Urena*, 162 S.W.3d 547, 551 (Tex. 2005). These elements cannot be established by mere conjecture or speculation. *Id.* The plaintiff must produce evidence from which a fact finder may reasonably infer the attorney's conduct caused the damages alleged. *Alexander*, 146 S.W.3d at 117. The test for cause in fact is whether the act or omission was a substantial factor in causing the injury without which the harm would not have resulted. *W. Invs., Inc.*, 162 S.W.3d at 551.

If the plaintiff alleges that the attorney's negligence caused an adverse outcome in prior litigation, the plaintiff must prove he would have prevailed in the underlying case but for his attorney's negligence. *Tommy Gio, Inc. v. Dunlop*, 348 S.W.3d 503, 507 (Tex. App.—Dallas 2011, pet. denied); *see also Greathouse v. McConnell*, 982 S.W.2d 165, 172 (Tex. App.—Houston [1st Dist.] 1998, pet. denied). The plaintiff's burden to prove this aspect of causation is called the "suit within a suit" requirement. *Greathouse*, 982 S.W.2d at 172–73. "Because the plaintiff must establish that the underlying suit would have been won 'but for' the attorney's breach of duty, this 'suit within a suit' requirement is necessarily a component of the plaintiff's burden on cause in

fact." *Ballesteros v. Jones*, 985 S.W.2d 485, 489 (Tex. App.—San Antonio 1998, pet. denied). The suit-within-a-suit causation requirement applies both to claims for legal malpractice and claims for a former attorney's alleged breach of fiduciary duty when the damages sought are based on the attorney's wrongful conduct in prior litigation. *Greathouse*, 982 S.W.2d 165 at 173. Generally, damages for a legal malpractice claim are calculated as the difference between the amount or result the plaintiff actually obtained and the amount or result he probably would have obtained but for his attorney's negligence. *Thompson & Knight LLP*, 444 S.W.3d at 163.

Expert testimony generally is required to establish causation in a legal malpractice suit. *See Alexander*, 146 S.W.3d at 119–20. For expert testimony to be competent, the expert must substantiate his opinion with "objective, evidence-based support" for his conclusions. *Wal-Mart Stores, Inc. v. Merrell*, 313 S.W.3d 837, 840 (Tex. 2010). Conclusory testimony does not raise a genuine issue of material fact. *Elizondo v. Krist*, 415 S.W.3d 259, 264 (Tex. 2013) ("A conclusory statement of an expert witness is insufficient to create a question of fact to defeat summary judgment.") (internal quotations and citation omitted). Expert testimony that is speculative or based on assumed facts contrary to the evidence also is legally insufficient to prove the facts testified to. *Thompson & Knight LLP*, 444 S.W.3d at 162. Expert testimony fails if there is "simply too great an analytical gap between the data and the opinion proffered." *Gammill v. Jack Williams Chevrolet, Inc.*, 972 S.W.2d 713, 726 (Tex. 1998).

Here, the summary judgment order does not specify the grounds upon which the trial court granted summary judgment. Therefore, we will affirm the trial court's summary judgment if any of the Attorneys' grounds are meritorious. *See Garza v. CTX Mortg. Co., LLC*, 285 S.W.3d 919, 922–23 (Tex. App.—Dallas 2009, no pet.). Because the issue is dispositive, we address whether the trial court could have properly granted Attorneys' motion for summary judgment on the element of causation.

## No Evidence of Proximate Cause

Attorneys' motion for summary judgment asserted, among other things, that there was no evidence that any alleged breach was the proximate cause of Greb's alleged injuries. By attacking the causation element of Greb's claims, Attorneys shifted the burden to Greb to adduce sufficient evidence to raise a genuine issue of material fact on that element. *Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex. 1997).

Greb predicates his legal malpractice claim on allegations that Attorneys failed to disclose a conflict of interest in representing Greb, Johnson, and J&G; and that because Attorneys did not disclose the conflict of interest, Greb did not retain and have the benefit of independent counsel. Greb argues that Attorneys' failure to disclose the conflict of interest caused injury because if he had independent counsel, the CNB lawsuit would have proceeded, CNB would not have been able to foreclose on J&G's assets and Greb's personal assets, and Greb would have been able to re-finance the CNB Notes or find a purchaser willing to pay more for J&G than Baymark paid. In particular, Greb asserts he would have had time to negotiate a $32 million sale of J&G to Forterra.

On appeal, Greb contends the trial court erred in granting summary judgment because Johnston's "deposition testimony, combined with his sworn affidavit and report, presented the trial court with a triable issue of material facts [sic] on proximate cause." Attorneys respond that "the testimony of [Greb's] causation expert, Randy Johnston, actually supports a finding of no causation," and Greb failed to present more than a scintilla of evidence on proximate cause. Assuming, without deciding, that Attorneys breached their duties to Greb, we conclude the summary judgment evidence did not satisfy the causation element of his claims.

*Randal Johnston's Expert Testimony*

In his summary judgment response, Greb argued the summary judgment evidence of causation with respect to Greb's injuries arising out of the CNB lawsuit consisted of Johnston's opinion that:

> Among the advice that separate, independent counsel would have given Mr. Greb was to be more aggressive in the lawsuit against the bank. Mr. Madole and his law firm, for example, let the two lawsuits with the bank sit inactive.
>
> * * *
>
> With the assistance of independent counsel and as the 60% owner of all the companies, Mr. Greb could have:
>
> - Threatened to remove Mr. Johnson from all positions of responsibility in the companies if he continued to sabotage Mr. Greb's efforts to maximize the value of the companies—and could have removed him if he did not cease such activities;
>
> - Pursued a temporary injunction to remove the threat of foreclosure;
>
> - Pursued discovery of bank documents to show that the bank was seeking to exploit the company's cash flow problems by recovering more than the principal and interest due on its loans through its threatened foreclose;
>
> - Opposed the bank's temporary injunction that wrongfully prevented Mr. Greb from seeking an alternate solution to the cash flow problem through a separate sale or refinancing . . .

In his deposition, however, Johnston testified he was "not rendering an opinion on the outcome of that trial if it had gone forward." While Johnston believed the claims asserted in the CNB lawsuit "had a real chance of success," he declined to conclude the lawsuit would have been successful, declaring, "I'm not gonna testify that [Attorneys] would have won. I haven't gone that far." Johnston further equivocated on the issue of proximate cause, testifying, "we are not in disagreement over the fact that unless [Greb] can demonstrate that independent counsel would have resulted [in] him having a more favorable result, he's going to be unable to satisfy his proximate cause component and . . . that's something I can't opine on." Johnston also testified he did not know whether Attorneys' withdrawal on August 21, 2015 caused damage to Greb.

Moreover, Johnston testified that the rule 11 agreements negotiated by Attorneys "in effect" provided "an injunction [against foreclosure] for 15 months to allow" Greb time to obtain re-financing or find a purchaser for J&G. Johnston admitted that the only offers to purchase J&G that he was aware of were the unsuccessful AuSable proposal and the Baymark transaction. The summary judgment evidence shows that Greb was unsuccessful in obtaining re-financing for the CNB Notes and unsuccessful in finding a buyer willing to purchase J&G at a price acceptable to him.

While Johnston's expert report concluded Attorneys' "breach of the standard of care and their breach of fiduciary duty were a proximate cause of financial damages to Mr. Greb," Johnston confirmed he had "no firsthand knowledge of the damages." Johnston merely opined in the hypothetical, that the "nature and character of the damages alleged by Mr. Greb are of the type that would be proximately caused by the acts of negligence and malfeasance he describes in the First Amended Petition."

While Johnston's opinion provides examples of steps independent counsel could have taken on Greb's behalf, we conclude his opinion that the outcome would have been different is speculative and conclusory. Johnston provides no facts to support his conclusions that:

- Independent counsel would have "remove[d] the threat of foreclosure" because "the bank would not have pursued an actual foreclosure if Mr. Greb had been advised to push back more aggressively, as he would have been advised if he had independent counsel";

- Independent counsel would have "show[n] that the bank was seeking to exploit the company's cash flow problems";

- If independent counsel had "pursued a temporary injunction, it would have been granted";

- Independent counsel would have prevented CNB from obtaining a TRO against Greb, allowing Greb to re-finance the CNB Notes or secure a "separate sale" of J&G;

- After eliminating the threat of foreclosure, Greb "could have consummated a sale of [J&G's] assets to the company [Forterra] that ultimately purchased all the assets for significantly more than the amount received [from Baymark]";

- Johnson was "sabotag[ing]" Greb's efforts to "maximize" J&G's value.

Johnston's testimony may raise an inference that a different attorney might have more aggressively pursued a temporary injunction to prevent CNB from foreclosing, but whether the trial court would have granted a request for an injunction is entirely speculative; as is Johnston's opinion that had the temporary injunction against Greb been denied, Greb would have re-financed the CNB Notes or sold J&G to a different buyer at a higher purchase price. To the contrary, the summary judgment evidence shows that Greb tried to obtain re-financing and tried to find a purchaser for J&G for at least fifteen months and was unable to do so. Johnston provides no factual basis for his opinion that CNB "would not have pursued an actual foreclosure" if Greb's attorney had been more "aggressive" in the CNB lawsuit, rendering his opinion both speculative and conclusory.

Because Johnston's causation testimony is conclusory and speculative, it constitutes no evidence and does not raise a genuine issue of material fact. *See Thompson & Knight LLP*, 444 S.W.3d at 162 (expert testimony that is conclusory, speculative or based on assumed facts contrary to the evidence is legally insufficient to prove the facts testified to); *Elizondo*, 415 S.W.3d at 264 (conclusory expert opinion will not defeat summary judgment).

In sum, we conclude that Greb offered no probative evidence that Attorneys' alleged failure to disclose a conflict of interest in their representation of Greb, Johnson, and J&G caused any damages to Greb, and therefore did not raise a genuine issue of material fact as to the causation element of his claims.

*Plamen Jordanoff's Expert Testimony*

On appeal, Greb relies on expert testimony in Plamen Jordanoff's report and affidavit to adduce evidence that Attorneys' failure to aggressively prosecute the CNB lawsuit caused Greb's

damages, *i.e.*, the lost value between what Baymark paid for J&G and the purchase price Greb would have obtained from Forterra. Greb maintains Jordanoff's report demonstrates that Forterra "would almost certainly" have paid Greb and Johnson $32 million for J&G if Attorneys "appropriately pursue[d] the lawsuit with [CNB]," as evidenced by Forterra's October 2016 purchase of J&G from Baymark for $32.4 million. Jordanoff's report concluded,

> [H]ad Mr. Greb and Mr. Johnson continued to own J&G and had they continued to offer it for sale, Forterra would still have purchased J&G and it would have paid a similar amount it paid on October 14, 2016 ($32.4 million). This would have been the case as the new owners held the business for a time period which was too short to make any lasting, material impact on the operations, asset base or profitability of the business.

Jordanoff's opinion is speculative and conclusory.[7] Although Jordanoff's report states that Forterra paid $32.4 million for J&G in October 2016, the report does not provide a factual basis for his vague conclusion that Forterra would have paid the same amount "had [Greb and Johnson] continued to offer it for sale" for an unspecified period of time. Jordanoff left Forterra in September 2015, and he was not involved in Forterra's purchase of J&G over a year later. When Jordanoff was working for Forterra, he "arranged a dinner between Mr. Greb and the top leaders of Lone Star . . . where Lone Star expressed their interest in acquiring J&G from Mr. Greb. This interest was pursued by both parties with some information exchanged between the parties over the summer of 2015." However, despite the efforts of Jordanoff, Lone Star, and Greb, the parties were not able to agree on a purchase price for J&G, much less consummate a sale to Forterra. Because Jordanoff's testimony that Forterra would have paid Greb and Johnson $32 million for J&G at some hypothetical point in the future is vague, speculative, and conclusory, it constitutes no evidence that Greb and Johnson would have been able to sell J&G to Forterra or anyone else

---

[7] In his deposition, Jordanoff could not identify any indication that Lone Star was willing to pay $32.4 million for J&G in 2015. He conceded that his opinion on the possible reasons Lone Star was willing to pay $32.4 million for J&G in October 2016 was speculation.

–15–

for $32 million, and it constitutes no evidence of J&G's value at the time Greb and Johnson were trying to sell the company. *See Elizondo*, 415 S.W.3d at 264 ("A conclusory statement of an expert witness is insufficient to create a question of fact to defeat summary judgment.") (footnote and internal quotations omitted).

Greb also contends, "there can be virtually no dispute that the company would have sold somewhere between $21 million and $32.5 million." Greb, however, misses the point. The question before this Court is not whether J&G could have sold for more than $15 million. The question is whether Attorneys' alleged failure to disclose the conflict of interest caused damages to Greb, and the summary judgment evidence does not show such causation. Rather, the summary judgment evidence shows that Greb *rejected* a purchase price "in the $20 million range" during his September 2015 discussions with Forterra, *after* signing the Baymark APA on August 28, 2015. Regardless of whether J&G sold for more than $15 million over a year after Greb's attempt to sell J&G to Forterra, the summary judgment evidence showed that in 2015, Forterra dismissed a $30 million purchase price for J&G, and Greb refused Forterra's suggested purchase price "in the $20 million range."

Jordanoff's conclusory and speculative opinion is no evidence of causation in this legal malpractice case and therefore does not raise a genuine issue of material fact.

### Gross Negligence

Greb pleaded that Attorneys' acts and omissions rose to the level of gross negligence. In order to prevail on a claim for gross negligence, a plaintiff first must show ordinary negligence. *Haddock v. Gruber*, No. 05-16-01113-CV, 2018 WL 1417453, at *14 (Tex. App.—Dallas March 22, 2018, pet. denied) (mem. op.). Here, we conclude that summary judgment on Greb's negligence claim against Attorneys was proper. Therefore, Greb's gross negligence claim also

–16–

fails. We conclude the trial court properly granted summary judgment on Greb's gross negligence claim against Attorneys.

## Breach of Fiduciary Duty

In addition to the duty of ordinary care, an attorney owes fiduciary duties to his client. *Willis v. Maverick*, 760 S.W.2d 642, 645 (Tex. 1998). Among other things, attorneys must "render a full and fair disclosure of facts material to the client's representation." *Id*. To prevail on a breach of fiduciary duty claim, a plaintiff must prove the attorney's alleged breach of fiduciary duty caused the plaintiff's damages. *See Taylor v. Alonso, Cersonsky & Garcia, P.C.*, 395 S.W.3d 178, 183 (Tex. App.—Houston [1st Dist.] 2012, no pet.).

Greb contends Carrington Coleman breached its fiduciary duty by simultaneously representing Greb, Johnson, and J&G despite a conflict of interest between the parties; by not alerting Greb to that conflict of interest; and by subsequently acting in their self-interest to collect attorney's fees and in Johnson's interest, to Greb's detriment. Carrington Coleman responds that Greb's breach of fiduciary duty allegations are nothing more than an improper "fracturing" of Greb's malpractice claims, and, in any case, Greb did not provide any evidence that any act or omission by Carrington Coleman proximately caused damage to Greb.

Our resolution of this case is based on Greb's failure to raise a fact issue with respect to the causation element of his claims. Causation is an element of a breach of fiduciary duty claim for alleged damages based on legal representation in underlying litigation. *Greathouse*, 982 S.W.2d 165 at 173. Greb did not provide any competent evidence that he would have prevailed in the CNB lawsuit but for Attorneys' alleged breach. Nor did Greb provide any competent evidence that if Attorneys had not breached their duties, he would have re-financed the CNB Notes or sold J&G to a different buyer at a higher purchase price. Because Greb had the burden—but failed—to raise a fact issue on whether Attorneys' actions caused him injury, and failed to provide

–17–

competent evidence that Greb's outcome would have been different but for Attorneys' alleged breach, we need not address whether his breach of fiduciary duty claim is an improper fracturing of his legal malpractice claim. Even if Greb's allegations could form the basis for a breach of fiduciary duty claim, Greb's failure to meet his burden with respect to causation vitiates any such claim. We conclude that Greb's failure to raise an issue of material fact on the causation element renders summary judgment proper on Greb's breach of fiduciary duty claim.

We affirm the trial court's judgment.

/Ken Molberg/
KEN MOLBERG
JUSTICE

180467F.P05



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

LARRY GREB, Appellant

No. 05-18-00467-CV        V.

BRET MADOLE AND CARRINGTON, COLEMAN, SLOMAN & BLUMENTHAL, LLP, Appellees

On Appeal from the 134th Judicial District Court, Dallas County, Texas
Trial Court Cause No. DC-16-12734.
Opinion delivered by Justice Molberg. Justices Myers and Carlyle participating.

In accordance with this Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

It is **ORDERED** that appellees BRET MADOLE AND CARRINGTON, COLEMAN, SLOMAN & BLUMENTHAL, LLP recover their costs of this appeal from appellant LARRY GREB.

Judgment entered this 3rd day of July, 2019.